# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JOSE ALEXANDER TORRES,                   1:09-cv-00969-LJO-DLB (HC)

                Petitioner,          FINDINGS AND RECOMMENDATION
                                        REGARDING PETITION FOR WRIT OF
    v.                                  HABEAS CORPUS

                                        [Doc. 1]
MIKE McDONALD,

                Respondent.
_____/

      Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

      Following a jury trial in the Stanislaus County Superior Court, Petitioner was convicted of robbery, participation in a criminal street gang, and illegal possession of a firearm by a felon.  The enhancements for personal use of a firearm and the commission of the offenses for the benefit of a criminal street gang were found true.  Petitioner was sentenced to forty-two years eight months in state prison.

      Petitioner filed a timely notice of appeal.  On January 31, 2008, the California Court of Appeal, Fifth Appellate District affirmed the judgment.  (Lodged Doc. No. 4.)  On March 5, 2008, Petitioner filed a petition for review in the California Supreme Court, which was denied on May 14, 2008.  (Lodged Doc. Nos. 5, 6.)

      Petitioner filed the instant federal petition for writ of habeas corpus on May 27, 2009.

1

1   (Court Doc. 1.)

2       Respondent filed an answer to the petition on September 9, 2009, and Petitioner filed a

3   traverse on November 9, 2009.  (Court Docs. 19, 25.)

4                          <u>STATEMENT OF FACTS</u>

5       Appellants Jose Torres, his brother Willie Wildmer Torres, and their
    associate Lawrence Mejia, were convicted of multiple felonies based on a string of
6   armed robberies committed at four convenience stores in Stanislaus County. The
    evidence established that Jose and Lawrence entered the stores and committed the
7   robberies, and that Willie acted as the getaway driver for the final charged offense.
    The jury also found the gang enhancements true, that the robberies were
8   committed for the benefit of a criminal street gang, the Nortenos.

9       On appeal, appellants challenge the admissibility of Lawrence's postarrest
    statements, whether the jury was properly instructed about those statements and
10  the gang allegations, the admissibility of the expert opinions on robberies and
    gangs, the sufficiency of the evidence as to the gang allegations, and the imposition
11  of probation report preparation fees. We will strike the probation report
    preparation fee as to Willie, order the abstract of judgment corrected as to
12  Lawrence, and otherwise affirm.

13  *Count I: Riverbank AM/PM Store*

14      Around 11:40 p.m. on May 22, 2005, Susan Butler was working as the cashier at
    the AM/PM convenience store on Oakdale and Patterson in Riverbank. She had removed
15  the cash register drawers and placed them on the counter to count the cash, when two
    men entered the store. One man was larger and heavier than the other. The larger man
16  walked to the beer cabinet and removed two or three 12-packs of Corona beer. The
    smaller man was wearing a hat and holding a gun. The gun was a "silverish" pistol. The
17  gunman went to the counter and told Butler, "This is a robbery, and it ain't no joke."
    Butler complied and gave him the money. The gunman asked for a carton of Marlboros.
18  Butler again complied. The larger man arrived at the counter and said, "Give me all of
    your Camels."  Butler was about to hand over the cigarettes but the gunman said, "No.
19  Come on. Let's go." The two men left together. They were not wearing any red clothing
    or did not make any gang statements or signs.
20
        Robert Stokes and his son drove into the store's parking lot and saw two Hispanic
21  men run out of the store. One man was larger than the other, and carried four cases of
    beer. Stokes remarked to that man, "I'd like to go to a party, too." Stokes testified the
22  smaller man stuck a gun in his face and "told me I'm not F'ing following him anyplace."
    The men ran in front of the Stokes's car, the smaller man aimed the gun at Stokes and his
23  son, and the smaller man warned, "Don't follow me, mother fucker."  The larger man
    threw the four cases of beer into the back of an older model Chevrolet pickup truck, and
24  Stokes believed the beer bottles broke when they landed into the truck bed. The two men
    got into the truck and the vehicle quickly left the scene.
25
        Stokes and his son went into the store and found Butler standing at the counter
26  and on the telephone. The cash register drawers were on the counter, and they asked
    Butler if she was okay. Butler was scared, upset, and crying, and said she had just been
27  robbed.

28      Stanislaus County Deputy Sheriff Ross Bays responded to the robbery dispatch

                                   2

and found the empty cash drawers on the counter. A criminalist took fingerprints off the drawers but the prints were not matched to anyone. Deputy Bays interviewed Stokes and his son, and they said the smaller man had a small silver or chrome semi-automatic handgun. Butler said both suspects were Hispanic males in their 20's. The gunman held the silver semi-automatic gun, and he was about five feet four inches tall, 160 to 170 pounds, had a thin mustache, wore a tank top, and had tattoos all over his forearms. The larger man, who walked out with the beer cases, was five feet nine inches tall and 200 pounds.

Deputy Bays also retrieved the store's surveillance videotape, which depicted two men entering the store, one man going to the back wall and taking beer, the other man pointing a gun at the clerk, the clerk emptying the cash drawers, and both men leaving the store. Deputy Bays put out a "be-on-the-lookout" warning for two Hispanic males in a 1960's white Chevrolet pickup truck.

A few days after the robbery, Detective Priscilla Woods joined the investigation because she knew about similar convenience store robberies in Modesto and Stanislaus County. Detective Woods contacted Detective Brocchini, who was investigating the other robberies, obtained photographs of the suspects and the vehicle used in those other robberies, and compared them with suspects depicted in the Riverbank AM/PM store's surveillance videotape. Woods determined one of the suspects from the other robberies (later determined to be Lawrence), looked similar to one of the men at the Riverbank AM/PM store, because he was wearing the same clothes, had the same weight, height, hair style and color, eyes and face, and was wearing a belt buckle with "N" on it.

Detective Woods presented a photographic lineup to Robert Stokes, which included a picture of Lawrence. Stokes could not identify any suspect. Woods also showed Stokes a photograph of the vehicle used in the other robberies. Stokes immediately identified the vehicle as the same white truck he saw the suspects enter in the AM/PM parking lot.

Based on this incident, Jose and Lawrence were charged with count I, robbery. At trial, Butler identified Jose as the smaller suspect with the gun. Butler testified she believed Lawrence looked like the larger man who took the beer, but she did not look that man in the face and instead focused on the gunman's face. Butler was never shown a photographic lineup with Jose's picture, and she was unable to identify anyone from a lineup with Lawrence's picture.

At trial, Robert Stokes positively identified Jose as the smaller man with the gun. Stokes's son testified he could "possibly" recognize the men again but did not identify anyone at trial. Also at trial, Stokes's son was shown a photograph of a truck driven by Willie Torres when he was arrested a few days later. He was certain he recognized the white Chevrolet truck depicted in the videotape, as the same vehicle the suspects used in the parking lot, because "I'm very good with vehicles and descriptions of vehicles and stuff. Looking at this truck, it's the same truck [as the one in the AM/PM parking lot]." Robert Stokes also identified the truck as the same one in the store's parking lot. The convenience store's surveillance tape, which depicted the robbery, was played for the jury.

Jose and Lawrence were convicted of count I, robbery, with findings as to both appellants that a principal personally used a firearm (§ 12022.53, subds.(b), (e)(1)); they committed the offense for the benefit of a criminal street gang; and that Jose personally used a firearm (§ 12022.5, subd. (a)).

*Count II: Modesto Stop-and-Save*

Around midnight on May 23, 2005, about 30 minutes after the Riverbank AM/PM

robbery, Adrian Niave was working as one of the clerks at Stop-and-Save store on Yosemite Boulevard in Modesto when a man entered and tried to buy cigarettes from the other clerk. The clerk refused to sell the cigarettes because the man did not have valid identification. The man left and then returned a minute later, and held a small chrome pistol in his left hand. The man pointed the gun at Niave and ordered him to put money into a bag. The gunman was wearing a black T-shirt and jean shorts. Niave complied and emptied the register. The gunman then demanded, "Down there, too," referring to the safe below the counter. Niave grabbed a handful of coins from the safe and threw them in the bag.

Niave testified the gunman had a tattoo of the letter "B" on the side of his neck. Niave noticed another man was standing by the door, with a red bandana or "rag" covering the lower portion of his face, and wearing blue jeans. Niave gave the money to the gunman, he headed for the door, the other man held open the door, and they both left. Niave thought they got into a gray Jeep Cherokee.

Based on this incident, Jose and Lawrence were charged with count II, robbery. Niave identified Lawrence as the gunman at the preliminary hearing and the trial. Niave was unable to identify the second suspect because his face was covered by the red rag. At trial, Detective Brocchini reviewed the store's surveillance tape and noted that the second suspect in the Stop-and-Save robbery was wearing the exact same hat, shirt, and long shorts as worn by the suspect later identified as Jose, during the first burglary at the Riverbank AM/PM store, which occurred just 30 minutes earlier. Brocchini also noted that during the Riverbank AM/PM burglary, Jose had a red bandana knotted around his neck, and that bandana was similar to the red rag which covered the second suspect's face at the Stop-and-Save robbery.

Jose and Lawrence were convicted of count II, robbery, with findings as to both appellants that a principal personally used a firearm (§ 12022.53, subds. (b), (e)(1)); and they committed the offense for the benefit of a criminal street gang; and that Lawrence personally used a firearm (§ 12022.5, subd. (a)).

*Counts III & IV: North Carpenter Quick-Stop*

Around 3:00 a.m. on May 25, 2005, Youbert Mazloumi was working at the Quick Stop store he owned, located on North Carpenter Road and Kansas Street in Modesto.[FN2] He was training a new employee in the back of the store when the front bell chimed. The new employee went to the front of the store, saw a man wearing a mask, and tried to hide in the store. Mazloumi looked out and saw two masked men. Both men were holding guns. The shorter man waved his gun, ordered Mazloumi to come out, and demanded money. Mazloumi went to the register, opened it, put the drawer on the counter, and both men took the money (count III). The shorter gunman also demanded Mazloumi's own money, and he emptied his pockets and gave his money to the gunman (count IV).

FN2. Mazloumi was unavailable at trial, and his preliminary hearing testimony was read to the jury.

Mazloumi testified both men were standing next to each other at the counter when they took the money from the register and his pockets. The shorter man wore a baseball cap and had a red bandana on his face as a mask, which covered his nose and mouth. Mazloumi could see the shorter man's eyes and part of his neck, and noticed an "A" tattooed on his neck. The taller man was wearing a multi-colored Halloween mask which completely covered his face. The men did not take any merchandise and left with the money.

Mazloumi was unable to identify anyone as the robbery suspects. However, Mazloumi was later shown a mask which had been recovered when Lawrence was arrested, and identified the mask as the one used in the robbery.

Around 3:04 a.m., Officer Paul MacDonald responded to Mazloumi's store, conducted an investigation, and obtained the store's surveillance videotape. The videotape was played for the jury.

Based on this incident, Jose and Lawrence were charged with count III, robbery from Mazloumi at the Quick Stop, and count IV, robbery of Mazloumi's personal money. Detective Brocchini testified the store's surveillance tape depicted a suspect wearing the same hat and red bandana that Jose wore in the Riverbank AM/PM and Stop-and-Save robberies.

Jose and Lawrence were convicted of count III, robbery of the Quick Stop, with findings as to both appellants that a principal used a firearm, the offense was committed for the benefit of a gang, and they personally used a firearm. The jury was unable to reach verdicts as to both Jose and Lawrence for count IV, robbery of Mazloumi, a mistrial was declared, and the charges were subsequently dismissed.

*Count V: Standiford AM/PM store*

The last robbery charged in this case occurred around 3:20 a.m. on May 25, 2005, just 20 minutes after the Quick Stop robbery. James Wisler was working at the AM/PM store on Standiford and Prescott in Modesto when two men entered the store. One man went to the cooler in the back of the store. The other man had a red bandana tied around his neck; it did not cover his face. This man held a revolver at Wisler and demanded money. Wisler emptied the cash register and gave the money to the gunman. The gunman asked for money from the other register and Wisler complied. The other man, who was larger than the gunman, took two cartons of Camel cigarettes. Wisler testified both men had tattoos, and the man who took the cigarettes had a tattoo of a yellow bumble bee ready to sting.

Kara Franklyn had just purchased gasoline at the AM/PM and went inside to get her receipt. When she entered the store, she saw two men at the counter facing the clerk. She realized one man was holding a shiny silver gun. She noticed a tattoo on the back of the gunman's neck that was partially covered, and appeared to be "half a sun or something like a C." The gunman wore a red bandana and a baseball cap with a black and white swirly design on it. Franklyn described the gunman as the smaller of the two suspects. The other suspect was taller and larger than the gunman, and he was gathering things in his arms. The cash register drawer was open, and Franklyn saw Wisler place the money in the gunman's bag. She also saw money in the larger man's hand. The larger man hit the smaller man on the shoulder and said, "Let's go." Both men ran out of the store and went around the corner.

Based on this incident, Jose and Lawrence were charged with count V, robbery. At trial, Franklyn identified Jose as the gunman, and testified she immediately recognized him when she attended a prior court hearing, even though there were other people in the courtroom on that occasion. Wisler identified Jose as the gunman and Lawrence as his accomplice. Detective Brocchini testified the store's surveillance tape revealed one suspect was wearing the same hat and red bandana which Jose wore in the prior robberies. As we will discuss *post,* Willie was subsequently apprehended as the getaway driver.

Jose, Lawrence, and Willie were convicted of count V, robbery, with findings as to all appellants that a principal personally used a firearm and they committed the offense for

5

the benefit of a criminal street gang; and both Jose and Lawrence personally used a firearm.

*Apprehension of Lawrence Mejia*

Appellants were apprehended in separate encounters with the police shortly after the robbery of the Standiford AM/PM store.

Around 3:23 a.m. on May 25, 2005, Officers Gutierrez and Yokom were driving on Prescott in a marked patrol car. They were responding to a burglary alarm at a school when they drove by the Standiford AM/PM store. They noticed a suspicious white older-model Chevrolet GMC pickup truck parked near the store, with the lights flickering. Officer Gutierrez knew about the convenience store robberies and realized the white truck was parked northbound, facing away from the store. He performed a U-turn, turned off all the lights on his patrol car, cruised by the white truck, and watched it. The driver was the only occupant of the white truck.

After observing the truck for a few minutes, the officers decided to continue to their original burglary dispatch and turned back on Prescott, but the truck pulled away and performed an illegal U-turn in front of the patrol car. Officer Gutierrez trained the patrol car's spotlight on the white truck as it passed in the opposite direction, and only saw the driver inside.

Shortly afterward, Officers Gutierrez and Yokom received a dispatch of a robbery alarm at the Standiford AM/PM store and that the suspects were on foot. They headed back to the convenience store with the patrol car's lights and siren on, and drove toward a canal with the intent to block the suspects' possible escape route.

As they arrived near the canal, Officer Gutierrez saw the same white truck with the same driver. Officer Yokom saw someone jump out of the truck bed and run toward the canal, and another person was already running in front of him. One of the running suspects appeared taller than the other. The shorter suspect was the person who jumped out of the truck bed. The officers put out a dispatch about the suspects' location, decided to let the truck driver get away, and got out of the patrol car to chase the other suspects on foot. They left on the patrol car's spotlight to illuminate the canal bank area. One suspect tripped on the canal bank and seemed to drop a light-colored object, then got up and continued to run. The other suspect appeared to jump a fence. Officers Gutierrez and Yokom thought they heard shots being fired, and they broke off the chase and returned to the patrol car for safety reasons.

The police had been investigating the North Carpenter Quick Stop robbery when the dispatch went out on the suspects in the Standiford AM/PM robbery. The police set up a perimeter around the area where Officers Gutierrez and Yokom saw the suspect jump the fence, and a SWAT team and K-9 units joined the search. Officer Gutierrez escorted one of the K-9 units through the area, and they heard and saw movement as if someone was stepping on leaves in one of the adjacent backyards.

Appellant Lawrence was apprehended by the SWAT team as he was hiding in the backyard of a residence with an address on Chippewa. Lawrence was found on the ground, next to a hot tub. A black baseball cap was also found in that backyard, on the patio next to the hot tub. Lawrence was wearing sweatpants that lacked belt loops, but he had a black canvas belt wrapped around his waist with the letter "N" on the belt buckle, signifying Nortenos.

The officers found a handgun and a rubber or plastic mask on the top of the

6

common fence line of the adjoining residence. The handgun was a real weapon and it had been placed inside the mask. One round was in the gun's chamber but the magazine was empty. There were two full cartons of Marlboro cigarettes and two full cartons of Camel cigarettes on the canal bank behind the houses. Lawrence's fingerprints were on one carton of Marlboro cigarettes and one carton of Camel cigarettes.

The police drove Wisler, the Standiford AM/PM store clerk, to Chippewa and Shawnee for an in-field showup with Lawrence. Wisler asked the officers to have Lawrence turn so he could see his neck, and Wilser identified Lawrence as the man who took the cigarettes, based on the bumble bee tattoo on the side of his neck. Wisler subsequently viewed a photographic lineup and identified Jose as the gunman. At the preliminary hearing and trial, Wisler identified Jose as the gunman and Lawrence as the person who took the cigarettes.

*Apprehension of Willie Torres*

At 3:27 a.m., Officer Costales responded to the dispatch of the robbery at Standiford AM/PM store, and received Officer Gutierrez's report about the suspects' vehicle as a white Chevrolet pickup truck, with the driver wearing a black jacket with black hair. As Costales approached the intersection of Cheyenne and Carver, he saw a truck which matched the description. Costales performed a traffic stop of the truck, and Costales and other officers approached the vehicle and ordered the occupant to get out.

Appellant Willie Wildmer Torres was the driver and sole occupant, and he complied with the officers' orders. Officer Costales searched the truck's passenger side and found a cell phone and pack of cigarettes in the ashtray. A red bandana was behind the passenger seat. Another cell phone was in Willie's pocket.

During the search of the truck, the cell phone in the truck's ashtray rang. Officer Costales asked Willie if he could answer it and Willie said yes. The cell phone rang a second time. Officer Wilson picked it up but it went to voicemail. Officer Wilson asked Willie for the code to retrieve the voicemail and Willie supplied that information. Officer Wilson punched in the code and listened to a garbled message, and then the cell phone rang again. Wilson answered it and heard a male voice. The caller did not identify himself, but the name "Anthony" appeared in the cell phone's caller ID screen.

The white truck that Willie was driving was registered to Lydia Lopez Anthony, wife of Paul Anthony Lopez, who was the older brother of Willie and Jose Torres. One of the cell phones in Willie's car belonged to Lawrence. Paul Anthony Lopez called Lawrence's cell phone just as Willie was being arrested and said, "Get out of there." [FN3] Lawrence's cell phone also contained Willie's cell phone number, along with several gang-related photographs, videos, and music.

FN3. Paul Anthony Lopez was not arrested in this case. Detectives Brocchini and Delgado explained that Paul was born in 1973 and appeared older than the suspects depicted in the surveillance videos.

Willie Torres was charged and convicted with count V, robbery of the Standiford AM/PM market, with the firearm and gang enhancements, based on his role in driving the getaway car.

*Apprehension of Jose Torres*

Around 3:30 a.m., Maria Santana, her father Raul, and her brother Paul, were leaving their house on Chippewa to go to work. As they were getting into the family's van,

Raul said, "Who's that?"  Maria looked and saw a man jump off the roof of her house. The man appeared at the van's passenger side, where Maria was sitting, and was holding a small chrome pistol. The man spoke to Raul, who was in the driver's seat, and said, "Can you give me a ride? The cops are after me."  The man offered gas money for the ride.

Maria told Raul not to give the man a ride, but Raul agreed to help the man. The man asked to go to Needham Liquor Store. Raul replied it was closed, but he agreed to drop him off somewhere else. The man got into the rear of the van and sat next to Maria's brother, Paul. Paul noticed the man had a tattoo of the letter "W" on left side of the back of his head. During the drive, the man said "he left his friend behind because he couldn't jump the fence and that he was at a bar, and he got into a fight or something went wrong." The man later said the bar fight story was not true, used a Spanish slang word-"jale"- which meant he did "a job," and said his friend could not jump the fence into Maria's backyard. Raul later explained to Paul that the man's slang word meant he had done "like robbery or something." The man put the gun in his pocket during the drive. Raul dropped off the man at the AM/PM market on 5th and I Streets, located downtown near the freeway.

Detective Brocchini later showed Maria a photographic lineup which contained Jose's picture. Maria initially said she could not identify anyone, but then picked Jose's picture and said that suspect stood out because of his "big head." At trial, Maria identified Jose and said she was pretty sure he was the man who got into their van, and that "I remember the picture, and I remember his face right here." She remembered the nose and cheek-bone area of his face. Maria testified that when she looked at the photographic lineup, she told the officer that she could not identify anyone because she "didn't really want to identify him. That's why," but knew "I had to do it." "Well, I have a conscience, so I know I had to do it, but I was just scared to, like." She was scared and nervous that she could be charged with an offense for giving him a ride.

Maria's brother could not identify anyone from a photographic lineup, but recognized the "W" tattoo on the back of Jose's head, as depicted in a photograph.

The police later obtained the surveillance videotape from the store where the Santanas dropped off the man, which depicted a silver van stop in front of the store and a man get out and walk into the store at 3:46 a.m. The man was wearing a hat and other clothing similar to what was worn in three of the four previous robberies. Detective Brocchini believed the man was Jose Torres, based on his prior personal dealings with Jose.

On May 26, 2005, the police placed a stake-out around the Oakdale house of Claudia Arciga, Jose Torres's girlfriend, and her roommate. The officers observed Jose at the house, and arrested him there. Michael Gratton, a documented Norteno member, was at the house when Jose was arrested. Jose was wearing a gold ring, which looked similar to the ring worn by one of the robbery suspects as depicted on the surveillance videotape of the Standiford AM/PM. An officer removed the ring from Jose's finger, and Jose said that he "wears it everywhere, and he's been wearing it for a long time." The police also seized Jose's phone book. Among the names and numbers in Jose's phone book was Jason "Loony" Cortez, an active Norteno who was involved in a tattoo shop homicide committed on a gang dropout, as ordered by Nuestra Familia. There was also a listing for someone named "China," with several phone numbers.

Detectives Brocchini and Delgado described Arciga's residence as a gang house. The police found a red bandana in Arciga's bedroom; there was a knot in the back of the bandana, similar to how the bandana was worn by the robbery suspect, as depicted by the Standiford AM/PM store's surveillance video. An empty carton of Marlboro cigarettes

8

was in the trash can.

The police found a vehicle parked outside Arciga's house which was quite dirty, and there were several words and initials written in the dust on the car. The initials "WWR" were on the vehicle's sunroof. "WWR" was known as the Wicked West Riders, a Norteno gang primarily based on Wheatley Avenue in southwest Modesto. The vehicle also had the word "Joser," which was Jose's admitted gang moniker, "Motown," meaning Modesto, and "WCN" and "XIV," which signified "West Coast Nortenos" and the number 14, a common sign for the Nortenos. The police did not record the car's license plate number and did not determine who the car belonged to. Detective Delgado testified that these dusty scribbles demonstrated to people that Arciga's residence was a West Coast Nortenos gang house, that gang members live or associate with the area, and to back off and not mess with the car or anyone else.

Officer Scott Muir testified that gang paraphernalia was found inside Arciga's house, including a jersey with the number 14 on it, a hat with "WCN" on it; a red bandana on a picture or mirror frame; photographs of people wearing and displaying red bandanas; photographs of Jose throwing a "W" and "C" gang signs for "West Coast"; photographs of Jose and other men throwing "West Coast" gang signs; photographs of Jose and other men wearing red rags and red clothing; and a photograph of Jose with Michael Gratton, an associate of Wicked West Riders.

*Lawrence's Postarrest Interview*

At 10:20 a.m. on May 25, 2005, Lawrence was interviewed by Detectives Brocchini, Delgado, and Owen. The interview lasted one and one-half hours, and portions of the videotape were played for the jury. Lawrence was advised of the Miranda [FN4] warnings; he waived his rights and agreed to answer questions.

FN4. *Miranda v. Arizona* (1966) 384 U.S. 436.

The officers advised Lawrence that they "pretty much" knew everything, they had pictures and photographs from the armed robberies, and Lawrence was "pretty darn clear" in every one of them. Lawrence did not deny that he was involved but said he did not know the other guys. Lawrence said he was from San Jose, he came down to Oakdale and was hanging out with a girl, and he needed money to get home. Lawrence's grandmother lived in the area.

Lawrence admitted his involvement in four armed robberies. Lawrence said he committed the robberies with a girl and the "other guy, that guy, I don't know his name." The girl drove him to the stores in "[s]ome old bucket," like a Datsun. Lawrence denied ever being in a white truck.

Lawrence said he committed the robberies with a guy he did not know, but the guy's name was "Mike." He did not know "Mike's" telephone number, and Mike's picture was not in his cell phone. Lawrence thought the first robbery was at Stop-and-Save, the clerk was a woman, and he just took money from that store. Lawrence said he took beer during one of the robberies and cigarettes during the last robbery, but he did not know what the other guy took. Lawrence said they went their separate ways after the robberies.

Detective Brocchini asked Lawrence if he got any money from the robberies. Lawrence replied he got $20 and some food, and "that dude just gave me 20 bucks." Brocchini asked if that was "[t]he same dude as tonight?" Lawrence replied, "Ahhhh I guess, I'm in the videos, the videos should show." Brocchini said he already knew who the other guy was, and he wanted to see if Lawrence was telling him the truth. Lawrence

9

replied he did not know anything, he was not from this area, and he was just trying to get home. Brocchini asked what Mike looked like, and if he had tattoos. Lawrence said Mike was about his height but maybe a little shorter, and he had tattoos of four dots and a cross on his hands. Lawrence did not know if Mike had tattoos on his head because he always wore a hat.

Brocchini asked Lawrence about the robbery that occurred earlier that night (count V, Standiford AM/PM). Lawrence again said he was just trying to get home, but the robbery was done by "me and the dude, fuckin' Mike and shit." Lawrence said he left his cell phone with "like one of the other guys" in case something happened. Brocchini asked Lawrence who he was with when he ran away that night. Lawrence said he was with "the Mike guy" when he ran away after the robbery. Brocchini advised him the police stopped a white truck, Lawrence's phone was in the truck, and asked who was in the truck. Lawrence replied he was "the Vince guy." Brocchini said the man was in custody but his name was not Vince. Lawrence said, "I really don't know him and shit. I met him with that guy today" for the first time.

Brocchini asked about the Quick Stop robbery (counts III & IV, Mazloumi) and whether he had a gun for that job, and Lawrence said no. Brocchini asked about the robbery earlier that night. Lawrence said he just "stood there" during that robbery and he just "displayed" a gun, but he did not fire a gun that night.

Brocchini said he did not believe the other man's name was Mike. At that moment in the interview, Lawrence's cell phone rang, Brocchini answered it, and the caller asked to speak with "Michael." Brocchini replied there were no "Michaels" on that phone and hung up. This incident happened in Lawrence's presence. Lawrence suggested that maybe "that guy," Mike, "used my phone and called."

Brocchini resumed the interview and asked Lawrence how he got to the store that night for the robbery. Lawrence said "some chick" drove him in her "little beat up bucket," and parked down the street, but he was not sure where. Lawrence said they used a .25-caliber gun that night, but it was not his gun and he did not know if it was loaded. Lawrence used a mask for the first burglary that night (counts III & IV, Quick Stop/Mazloumi) but failed to wear the mask for the last burglary at the Standiford AM/PM. Lawrence did not know why he did not wear the mask since it was in his pocket. Lawrence added he wanted to cooperate more but "that dude" just kept him on a "need to know basis." Lawrence said that the other day, he got a little bit of money from the robberies to buy a toothbrush, deodorant, and something to eat, but he did not get anything tonight.

Brocchini asked Lawrence about running away from the white truck and down the canal bank, and that he left his cell phone in the truck. Lawrence said he did not know anything about a truck, and added, "I think he was around that area, I don't know, I didn't see him around [the] area," and he would have asked that guy for a ride "if he was around the area" as he ran away. Brocchini explained the police followed the white guy and "you guys" ran away and the truck took off, but the police caught the truck with Lawrence's cell phone. Lawrence again said he was not in the truck. Brocchini asked if they were supposed to hook up with the truck. Lawrence replied that he did not know "the dude," and "if I woulda knew who he was and I needed to get outta there I woulda jumped in know what I mean." Brocchini again asked if Lawrence loaned his cell phone to the guy in the white truck. Lawrence said he did not think so, and "if I woulda seen somebody that I knew out here, I woulda ran towards to jump in their car rather than to try run around some area I didn't even know."

Brocchini asked Lawrence what happened to the guy who ran away with him.

10

Lawrence said "he was gone" and "I kept running and I went somewhere else. He was gone before I did." Lawrence tossed the cigarettes because they were not worth it.

The officers asked Lawrence what gang he claimed. Lawrence replied that he was "a Northerner" with "Varrio Eastside" in San Jose. There were about 15 guys in Varrio Eastside, but they did not commit any crimes, and his "homies" had jobs and got mad at him when he drank and did stuff. Brocchini asked what Mike and Vince claimed. Lawrence said he just met Vince that day, he did not know about Mike, but he guessed Mike might be a Northerner. He never saw tattoos on Mike's head or neck because he was always wearing a hat.

Lawrence said that while he was a Northerner, he did not know the people in Modesto and denied he was a West Coast Norteno. Lawrence said his older brothers were Nortenos, he started hanging out with them when he was six years old, and he claimed Nortenos when he was 13 years old because he wanted to be like his brothers. One brother was in prison for attempted murder, and the other brother was married and doing well in San Jose. He admitted that other members of Varrio Eastside had gone to prison, but that was a long time ago and those people were dead now.

Detective Brocchini asked Lawrence about "Mug," and why he received calls from him. Lawrence said "Mug" was a friend of his brothers and "[j]ust some guy I know" from San Jose. Lawrence admitted there were pictures of Mug and his San Jose friends in his cell phone, and Mug was throwing a gang sign in the photograph. Lawrence said he did not have any pictures of Mike in his cell phone, and Mike did not know Mug.

Brocchini asked why "Mug" called Lawrence's cell phone at 3:00 a.m., one minute after the robbery, and Lawrence called him back. Lawrence said he did not know. Brocchini advised Lawrence that "Mug" was Paul Anthony Lopez, who owned the white truck. Lawrence said he just knew him as "Mug," but insisted Mug was not involved in the robberies, Mug's truck was not involved, and he was not in "Mug's" truck after the robberies. Brocchini replied the white truck was on the surveillance videotape from the robbery where they took the beer. Lawrence again said a girl "was drivin' us around in some little fuckin' bucket car," and he was not in a truck.

Brocchini asked Lawrence how many robberies he committed since he was in Modesto. Lawrence said four. Brocchini asked if he did the robberies with the same people. Lawrence replied the girl drove him but he was not with "the same other guy even." Lawrence said he didn't usually "do this shit" but the girl asked, "you wanna make some money," he said yes, and she drove him to the stores.

Brocchini asked the girl's name, and Lawrence said he was staying in Modesto with a "chick" named "Cheena," and she drove him to the robberies in her little Datsun bucket. Cheena also supplied the gun used in the robberies. Lawrence did not have her phone number and was not sure where she lived because "she's just like a floater," and again explained "people just keep me on a need to know basis, 'cause they don't know me...."

Brocchini told Lawrence that the police arrested Willie Torres, and he had Lawrence's cell phone. Lawrence replied: "Oh, I don't know. All I knew his name was Vince."

Brocchini asked Lawrence how much money he got from the four robberies. Lawrence replied he got about $30 or $40, and "they just gave me little something to eat." During the first robbery, he did not use the gun and he just got the beer. Lawrence admitted he committed a second robbery shortly after the first robbery, and he used the

11

gun during the second robbery. During the second robbery, he did not wear a mask, he lifted up his shirt to show the gun to the clerk, and asked for the money. Lawrence said another person was by the door. The clerk put the money in the bag, and Lawrence gave the bag to Cheena, who was waiting in her little Datsun.

"... I just gave the fuckin' girl the bag and shit and said here, but I got this for everybody. Like I said they just gave me like fuckin' little bit."

Cheena gave him some money, and he did not know what she gave to the other guy. Cheena dropped him off at his grandmother's house. Later on, Cheena picked up Lawrence from his grandmother's house and they spent the night together at another's person's house, but Lawrence did not know the person or the location.

Lawrence admitted he was involved in two robberies that night (counts III & IV, Quick Stop/Mazloumi, and count V, Standiford AM/PM). During the first robbery of that evening (counts III & IV, Quick Stop), he wore a mask and showed the gun to the clerk, stood by the door, and he grabbed some money. He gave all the money "to the dude again," and "to the girl." "I didn't even get any, I just gave it to that chick." Lawrence added that he thought Mike was from Turlock. Cheena drove them to the last robbery, where he took some cigarettes, but she left while Lawrence and Mike were in the store.

Brocchini asked Lawrence when he hooked up with Vince, and Lawrence replied it was at the girl's house. Brocchini suggested that Lawrence was a pretty nice guy to commit robberies and give away the money. Lawrence replied he was "thankful" that they "let me do a little summin' so I can survive know what I mean?" Lawrence admitted he was a Northerner but denied he did anything for the gang, and "I don't know these people out here" and he just knew "that chick." Lawrence said the chick trusted him, and complained that he trusted her but she was "lookin' for a guinea pig know what I mean?"

Brocchini again asked when he gave his cell phone to Vince. Lawrence said he was at some place where he stayed with the girl. "I just said hey here's my phone in case you need to call anybody." Lawrence did not know where Cheena lived and did not know how to get there. Brocchini asked if Mug was involved even a little bit. Lawrence said no, but he believed Mug "know[s] those people" because Mug told him not to mess with people out here. Brocchini asked why Mug called his cell phone at 3:00 a.m., and whether he said he was hiding in another yard. Lawrence emphatically said no.

Brocchini asked Lawrence to explain his tattoos. Lawrence said he had a "SJ" for San Jose, a "Mongolian warrior," "V" for Varrio Eastside, his San Jose neighborhood, "VES" for Varrio Eastside, and a bumble bee.[FN5] Detective Delgado asked if one tattoo was covered up, and Lawrence clarified the tattoo was a "4," it was not a cover-up, and he had "1" on the other side of his hand. He had a "Huelga" bird on his stomach, and he got it after a Cesar Chavez march and it was just a Mexican symbol, and not about the Nortenos.

FN5. The witness to one of the robberies said the suspect had a bumble bee tattoo.

Detective Brocchini advised Lawrence that "the dude you're callin' Vince," who had just been arrested, was "Mug's" brother. He showed Lawrence a photograph of this person, and again asked if Lawrence knew "Vince." Lawrence said he knew "Mug" had a brother from San Jose but had not seen him since he was a little kid.

"BROCCHINI: And now you're doin' robberies with ah, doin' 4 robberies and your phone, and we arrest you with Mug's brother and your phone is-Mug's brother has your phone, you tellin' me you didn't know that was there-that's his brother?

1     "MEJIA: Ah like I said I only knew him as Vince, or Vince and shit, I know him as
      Vince. I don't know fuckin' to, like hey, I'm being honest. I really am bein' honest."

2

3     Detective Delgado asked if Vince gave him a ride in the truck. Lawrence said no,
      he was never in the truck, and some girl drove him around.

4     "I'll tell you right up front I wasn't [in] no truck. Guarantee ya I wasn't in no
      truck."

5

6     The officers advised Lawrence that the white truck was on the surveillance
      videotape from the first robberies. Brocchini said he understood that Lawrence was trying

7     to protect "your Norteno homeboys," the guys he knew as Vince and Mike, and they
      knew he was in the truck. Lawrence insisted he was never in a white truck and "the cop

8     didn't see me in that truck," he did not know who was driving that truck, and the girl
      drove him around. Lawrence admitted he saw a white truck that "had some dude in it real

9     quick as I ran." Brocchini again asked how his cell phone got into that truck. Lawrence
      again replied he "left it with that guy Vince" because he did not want to take it to the

10    robbery and drop it.

11    Detective Delgado again asked who went into the store with him that night.
      Lawrence again said the "girl took me" and Mike went into the store, and "when we came

12    out she was gone." Brocchini insisted "[t]he dude in the store was Mike's, was Mug's
      brother. His youngest brother and ah the fact that now you're told me that you and Mug

13    are like family friends, it's pretty obvious." Lawrence again denied it and said Mug was
      just a family friend. Officer Delgado said he went into store with Mug, who he claimed

14    was Mike. Lawrence again said he went with Mike from Turlock, and he had tattoos on
      his neck that said "ES" for Eastside. Delgado showed Lawrence photographs from the

15    surveillance cameras, and said "Eastside" was not on the guy's neck.

16    "Delgado: ... Okay so don't give us that line of crap. You're tryin' to protect these
      guys and I-we respect that, knowing that you're tryin' to protect your homeboys,

17    'cause that's what you do. Alright?

18    "Mejia: You said that they were homies and shit, I don't know these guys."

19    The officers advised Lawrence that they were his homies and would not have
      committed a robbery with him otherwise. Lawrence went back to the "chick" and

20    complained he trusted her but "she was just using me as a dick head," and she made out
      until he got busted. Lawrence complained the girl left him in a house all day, then picked

21    him up for the robberies.

22    Both officers replied that he was "so fulla crap" and to show them more respect,
      and Delgado asked if he was a sex slave. Delgado again asked the girl's name, and

23    Lawrence only knew her as Cheena, and she drove an "old ass fucked up bucket like a
      Datsun." Delgado said he was not helping himself. Brocchini said they had him in the

24    truck twice, once on video and once when the police saw him. He might have been with
      "Cheena" during the other two robberies "but those two you can't deny bein' in that white

25    truck," his cell phone was in that truck, and maybe his fingerprints were in the truck.
      Brocchini asked Lawrence how he would explain things if his fingerprints were in the

26    truck. Lawrence said he did not remember being in the truck, and "I'll stick to my word
      out there. That cop did not see me in that truck. I didn't get in that truck."

27    "BROCCHINI: Okay maybe he saw you standin' outside and he saw Jose gettin'
      outta the back of it, but you were with the truck, I mean you're, well soon as you

28    guys split up cops came after you, cops went after the truck, it's....

13

"MEJIA: I said I was with a guy named Mike.

"BROCCHINI: I said you were guy-Jose. I don't think you were with Mike and I think you know it, but you can say Mike if you want."

Lawrence replied the guys gave him their names. Brocchini said he was in the truck with Willie and asked if he was scared of these guys. Lawrence chuckled and said no. Delgado said he must be scared because he was lying about the truck, and the truck was nothing compared to the robbery, and he was already admitting having a gun during the robbery. Brocchini added that Lawrence did not want to say anything about the truck because that put the spot on his homeboys, that he knew Mug, and Willie was Mug's brother "and we're lookin' for his other brother now." Lawrence said he just knew Mug through old family friends, and he knew his brothers a long time ago. He did not think Mug was with Varrio Eastside.

Brocchini said it looked like Lawrence was "payin' somethin' off" because he was an admitted gang member but committed four armed robberies and only got $30. Lawrence again said he did not know anyone in town and just wanted to get something to eat. Brocchini suggested Lawrence had enough money to leave Modesto after the first robbery. Lawrence replied that they had to "give to the girl know what I mean?" Brocchini asked why he would give the money to the girl when he committed the robbery. Lawrence said she was the one "thinking of this know what I mean?"

The officers said they knew what was going on, and that Lawrence was "payin' taxes." Lawrence chuckled. The officers continued that the girl was "a channeler" and he was "channelin' all the money to her, 'cause she takes care of it," because her "old man" was locked up. Delgado asked why he would take a chance of going to prison for 10 years and give the money to some girl. Lawrence said he did not know anyone there and she was the only person he knew. He had no other way and was trying to get some money to get back to San Jose. Lawrence said he was supposed to go to Disneyland with his family the next day. Delgado suggested Lawrence was "puttin' in all work right now" by committing robberies and giving the money to someone else; Lawrence denied it.

Brocchini asked Lawrence if he was a West Coast Norteno. Lawrence said no. Brocchini asked him about a photograph in his cell phone, where he was with a group and someone was throwing "W" and "C," West Coast handsigns. Brocchini asked if that person was Mug, and Lawrence said yes. Brocchini said he was in a photograph with a group of guys wearing red and claiming West Coast, they had arrested Willie and Jose who were both West Coast Nortenos, and "now I see you right in the midst of 'em." Brocchini asked if Mike and Vince were in the photographs, and Lawrence said no. The officers said Lawrence was obviously West Coast because he was in the middle of the photograph. Lawrence said they were all friends from San Jose and not from Modesto, and they were not from any gangs.

Brocchini again returned to the white truck, and told Lawrence that he did not even know what Willie had said, especially since Willie never went into the store. Willie was scared, he was already on parole, and he had no reason to lie. "I mean your phone is in his car, you know, he, he basically says he just gave you a ride there, you and Mike. But you're over here wantin' to say you don't even know the dude. You don't know, you know some dude named Vince. You never been in the car. That ain't the truth though."

Brocchini instructed Lawrence that he was going to "walk this dude out," presumably referring to Willie, and for Lawrence to look at him and tell him if that guy was Vince who had his phone. Brocchini said the other guy would not see him. There was a pause and Lawrence said, "Naw that dude wasn't the Vince guy," presumably referring

to Willie, and that he did not know the guy. Brocchini asked who had his phone. Lawrence replied he did not know. Brocchini advised Lawrence that the guy he just looked at was Mug's brother, he had Lawrence's cell phone, and the police got it from him right after Lawrence ran. Lawrence said he did not know the other people, he did not call the dude, and that was not the guy he gave his phone to. Lawrence said he went to the store with Mug on a "regular legit" visit, he committed the robberies with a guy he knew as "Mike," and the girl drove.

> "Brocchini: Okay it's Mike. You and Mike, but there was no girl in that truck. There was no girl in that truck. Okay, does that re-does it refresh your memory?

> "Mejia: No (chuckle), I mean I'm not gonna start changin' the stories up and shit, I mean."

Detective Brocchini asked Lawrence about the gun that "Mike" had. Lawrence said Mike used a semi-automatic gun, he also used a semi-automatic gun, it only had one bullet, he never fired the gun, and he pointed it away from people. Lawrence asked how much time he was looking at, and said his adult record was clean. Delgado said things were pretty serious and it was up to the district attorney.

The officers again asked how the dude got his phone and that he had been in the truck. Brocchini said Lawrence had just looked at Mug's brother and they were both going to jail for the robberies. Lawrence asked if he was looking at four felony convictions, with 10 years each. Brocchini asked if he wanted to go to prison, and if that was why he did the robberies. Lawrence said he was being "a dick head" and it was "a stupid, fuckin' decision." Brocchini said he believed about half of Lawrence's story, and knew he was protecting the other dudes since he would not even admit calling them on his cell phone. Lawrence replied: "The dudes who you're lookin' for I guarantee I'm not in pictures or their numbers are not in my phone." Brocchini replied that Mug called Lawrence's phone and Willie's phone at 3:06 a.m. "and said get outta Dodge, get outta here, cops are everywhere. That tells me Mug was there too." Lawrence said maybe it was Mug and the Vince guy, and the "Vince guy knew what we were gonna do" and Mug was "tryin' to get us t[o] stop it before we did it or summin', I don't know." "I know he didn't want us to do that shit and ya know."

Brocchini asked Lawrence if they robbed any of the clerks during the four robberies with Mike, and made the clerk empty his pockets, and showed him a photograph. Lawrence said no, and that he was standing at the door and did not take money directly from the clerk.

As the interview ended, the officers told Lawrence that he would be placed in protective custody because there were a lot of Surenos in jail. Lawrence said that was not necessary and he got along with all the Nortenos. Detective Delgado asked Lawrence if he could be housed with the Nortenos, and Lawrence said yes. Delgado asked if he was a dropout or active Norteno. Lawrence said he was not a dropout and was not sure if he was active, but he had nothing to worry about. Brocchini noted "you're goin' to jail with Willie over here." Lawrence replied, "That's fine I never seen the guy, so I got nothin' to worry about." Brocchini suggested that Willie might think he was going to jail because of Lawrence. Lawrence said that was no reason to put him in protective custody, that he was not a dropout, and he could be housed with the Nortenos.

*Lawrence's Postarrest Statements to his Family*

At 3:43 p.m. on May 25, 2005, Lawrence called his brother from jail. Lawrence told his brother, "They caught-they caught me with fucking everything. They caught me

with-fucking with my mask, all that shit. See, they already know it was me." A sign above the jail telephone warned users that the calls were monitored or recorded.

At 6:34 p.m. on May 25, 2005, Lawrence called his father in San Jose, and a transcript of that call was introduced to the jury. His father asked if he was off the hook. Lawrence said not yet. His father said he knew everything, "Ah you guys doin' all the ro-all that shit. ...." Lawrence said, "I know." His father continued, "and I know what it was for." Lawrence asked what was it for. His father replied, "For the shit." His father said, "You know what Larry you had no business over there. You know-you-you completely just screwed yourself. Or somebody screwed you." Lawrence replied, "Man it was me."

Lawrence's father chastised him for screwing up because "[y]ou didn't wanna be living at home and you-you wanted to be out there-bein' a big fool. You know?" His father asked what they had him for. Lawrence replied, "They have me for four armed robberies with my face on videotape. They caught me with a gun-the mask I used-gang enhancement." His father asked what kind of gang. Lawrence said they were saying "I was doin' all this shit out here for the gangs and all that." Lawrence added, "[T]hey busted me like right around the corner from the scene." His father thought he was arrested during a raid on a house. Lawrence explained:

"No. I was-they caught me like right when we did it-the fuckin' cops came. And we had jumped backyards for the fuckin' they had blocked it all off and the SWAT team came in the backyard and they got me."

His father offered to send money but did not think he could get an attorney. Lawrence replied there was "no point to it" because "I'm on video and every-you know?"

Lawrence's father told him not to be stupid "and tell 'em all this and that-this and that. Like you always do." Lawrence replied, "They have me on video I can't tell 'em nothing." His father asked if he already told them. Lawrence said, "Oh hell no I didn't do all that." His father asked, "You didn't even know the people, humh?" Lawrence replied, "Naw-they're homies," and "They were dudes from out here."

Lawrence also said, "I shouldn't be here long because I'm not gonna fight a case or anything, they already have all the evidence." His father replied that he still had to fight it. Lawrence said, "They caught me with everything," and "with the mask and a gun right around the corner there." His father advised him not to plead guilty and get "what they want" but to make a deal. Lawrence replied, "Well what do I say when they're showin' me tapes of me and all that shit?" His father said he still had to fight it and make a deal. His father also suggested that he tell his public defender that he was "doin' this shit" because "it was the drugs" and he was stranded there.

*Jose's Postarrest Statements to his Family*

Jose's first visitors in jail were his girlfriend, Claudia Arciga, his mother, and a child, and that visit was tape-recorded. Jose told the child to be good while he was in custody. Jose told his mother that Detective Brocchini had seen the pictures and "he's trying to say it's me." Jose told his mother: "Nothing, they ain't got nothing. So he's in most likely than me. Just get fucking blank me, and Larry's the one that gonna take the rap, know what I mean?"

Jose told Arciga: "They found that. Fuckin' why did Melissa [presumably Arciga's roommate] give him permission to search the house?" Arciga replied, "Well, I did, too." Jose said, "You guys are stupid," and that the officers found "[t]he carton, gang-related pictures, too, shit like that." Arciga exclaimed, "Oh, no." Jose told Arciga to keep "all of

that shit that's there," but he wanted his mother "to get my clothes. So if the cops go to my house, they won't be like, well, he's not living here, and that's why I'm registered to my mom's. You know what I mean?"

Jose continued his conversation with Arciga and said: "Yeah, so fuckin' went to court today. Me and my brother and-and Larry. Shit ain't looking too good." Arciga asked whether it was worth it, and Jose replied, "Fuck no. That's what I was thinking all of the time I was fucking there." "I said that's all I was thinking all of the time I was in the back seat of the car. I just don't know how they found out where I was at." Arciga told Jose he should have "just stayed home those times I told you to," and he was "hard-headed" and "retarded." Jose replied, "I just needed to get some money, some easy-ass money. And that's what I tried to do." Arciga asked, "And what did you get out of it?" Jose replied, "Discipline."

Jose told Arciga to find some pictures and send them to him, but not to send any pictures which were gang-related or had "red pano," and "[j]ust got to find the pictures where I'm not doing anything." Arciga told Jose not to get into any fights, and Jose replied he was not "in YA anymore." Arciga said, "Well, still you're retarded. You thinking you're all made of metal?" Jose replied, "Shut up. Not coming here to do that."

*Gang Evidence*

The prosecution introduced evidence as to the appellants' association and active involvement with the Norteno gangs. From 1998 to 2000, Ra Pouv was Willie Torres' probation officer. Willie was on Pouv's caseload as a high risk gang offender. During that period, Pouv met with Willie at least 25 times, reviewed the terms of his probation, and asked if he associated with gangs, in violation of the terms of his probation. Each time, Willie said he did not associate with gang members anymore, but Pouv saw Willie with gang members about 10 times.

On January 6, 2000, a probation search was conducted at Willie's home, and officers found business cards of the company that promoted the "Generations of United Nortenos" CD, a plaque which said "West Side," and a red jersey. Willie had a "Mongolian style haircut," with his hair shaved close with a patch at the top grown into a ponytail, which is a symbol of the Nortenos.

On October 10, 2001, Modesto Police officers had contact with Willie and observed several tattoos: "BWSN" on his stomach, a Huelga bird on his right arm, and "Brown Pride" oh next to the Huelga bird. Willie said "BWSN" meant "Big West Side Norteno." Willie said his uncle gave him the Huelga bird tattoo when his uncle got out of prison and Willie was jumped into the gang. Willie talked about his knowledge of the Nortenos and the "Generations of United Nortenos" CD, and he was passing out cards promoting the CD.

On June 18, 2003, Ra Pouv was an officer with the Modesto Police Department and had another contact with Willie Torres. Willie said he used to claim East Side Nortenos when he was a teenager.

On July 4, 2003, Modesto Police Officer John Sanchez had contact with Jose. Jose was wearing a white tank top and black shorts. Sanchez asked Jose if he was a gang member. Jose said yes and that he was "a West Coast Norteno." Jose said he was also known as "Joser," and claimed as a West Coast Norteno for three years. Sanchez noticed Jose had tattoos on his left arm, left hand, and right hand.

On August 7, 2004, an officer conducted a traffic stop near the Turlock

fairgrounds and determined Jose was in the car with Michael Gratton and Victor Montoya, both documented Nortenos. Jose said he used to claim Nortenos.

On August 21, 2004, Officer Pouv had contact with Jose. Pouv had met Jose based on his prior contacts with Willie. Jose was with "Primo" Gratton when Pouv spoke with him. Gratton was a documented Norteno, and his father, Robert Gratton, was one of the leaders of Nuestra Familia, the Norteno gang in the California prison system. [FN6] Jose said he "used to claim" West Side Nortenos. Jose was not wearing or displaying any gang clothes or paraphernalia. He had tattoos of "WCN" on the back of his head, "West Coast Nortenos" on his left arm, "[s]inful thoughts" on the back of his neck, "WSN" on the web of his left hand, "West Coast" on his left ear, four dots on his left fingers, one dot on his right finger, and one star on his left elbow.

> FN6. As we will discuss *post,* Detective Delgado testified that Robert Gratton was a local Modesto Norteno who became the leader of Nuestra Familia in prison, and directed Nuestra Familia to produce a CD, entitled "Generations of United Nortenos," which was distributed to the Norteno street gangs and directed them to unite as a gang instead of fighting within themselves, and direct all their attention against the rival Surenos. The CD had been found all over Northern California in the homes of Norteno gang members.

On September 2, 2004, Modesto Police Officer Ivan Valencia observed Jose, Victor Montoya, and Michael Gratton sitting on a bench at Mellis Park, an area where there was a lot of gang activity. Gratton was using a marker to write Norteno gang graffiti on the bench. Gratton had previously admitted to Valencia that he was a Norteno, Montoya admitted at that time he was a Norteno, and Jose said he was an ex-gang member. Jose was wearing black and red tennis shoes. Valencia had previous contacts with Jose and he never admitted being a current Norteno, but Valencia did not believe him based on his tattoos, clothing, and his association with other Nortenos such as Gratton and Montoya. Jose had a "WCN" tattoo on the back of his head, and "every time I've contacted him, he's always had that area shaved so you can clearly see the tattoo," which Valencia believed meant he was still promoting the gang. Jose said "WCN" meant West Coast Nortenos.

On September 8, 2004, Officer Matthew Spurlock contacted Jose in Modesto. Jose told Spurlock he was a member of the Nortenos. Jose was wearing a black hat, black T-shirt, and black shorts. Jose had a "WCN" tattoo on the back of his head, meaning "West Coast Nortenos." On his neck, he had tattoos of "West Coast" and "Bad Boys." He had tattoos of "West Coast Nortenos" on his left arm, four black dots on his left hand, and one dot on his right hand.

On October 29, 2004, Officer Valencia conducted a traffic stop and Jose was in the vehicle with Johnny Reyna and Jimmy Alvarado; Reyna admitted being an associate and Alvarado admitted being a member of the Nortenos. Jose was wearing a red, gray and black jacket, red and white baseball cap, red and white tennis shoes, and a red T-shirt. Jose claimed he was a drop-out from the gang.

On December 22, 2004, Officer Valencia assisted another officer on a traffic stop, and Jose was in the car with Michael Gratton and Mark Soto, both admitted Nortenos. Jose said he was related to Gratton. Jose was not wearing any red. Valencia asked Jose why he was with Nortenos when he always claimed to be a gang drop out. Jose said he hung around with them but did not belong in the gang, and he was an ex-member of WCN. At that time, Jose was identified as a member of the Wicked West Riders and Nortenos.

On March 2, 2005, Officer Serratos had contact with Jose while he was with Victor Montoya, an admitted active Norteno member.

On March 3, 2005, officers spoke to Primo Gratton (not Michael Gratton), who said that Jose was an active member in the Nortenos.

On March 9, 2005, officers conducted a search of a house on El Vista and seized photographs of Jose wearing red and throwing gang signs for the West Coast Nortenos, along with other Norteno members.

On March 20, 2005, Modesto Police Officer Richard Rodarte had contact with Jose when he was seen in a convenience store, about to commit a "beer run" with some associates. Rodarte asked Jose if he was a gang member. Jose said he was a member of the West Coast Nortenos. Jose said he had a black solid star tattoo on his left elbow, and he earned it by slashing a rival Sureno in CYA. Jose had other tattoos, including "WCN," for West Coast Nortenos, on the back of his head. On the right side of his neck, he had "Bad Boys" and "Sinful Throughts." On the left side of his neck, he had "West Coast California." On the left forearm, he had "West Coast Nortenos." On the left hand, he had four dots on his knuckles, and "WSN" on the web of his left hand. There was one dot on his right hand. The one and four dots meant "14," the number associated with Nortenos, since "N" is the 14th letter of the alphabet. On his stomach, it said "WCN," for "West Coast Nortenos." Jose said he lived on El Vista Avenue. He was wearing a white T-shirt, black pants, and a black belt; he was not wearing or displaying red.

On April 14, 2005, Detective Mike Richards contacted Jose, who admitted he was a West Coast Norteno. Jose was wearing a red and white baseball cap, jersey, and shoes.

Detective Delgado testified that on May 8, 2005, just a few days before the robberies began in this case, a group of Norteno gang members were creating a loud disturbance in the parking lot of a 7-Eleven in Modesto, and the clerk asked them to leave. The gang members took that as a sign of disrespect, and they attacked the clerk and beat him with a pipe. The gang members fled in a vehicle but were apprehended, and Jose was in the vehicle with them.

It was stipulated that Jose Torres had one felony conviction at the time of the offenses in this case.

*Expert Testimony on Robberies*

Detective Brocchini testified over defense objections as an expert witness on robberies. [FN7] Brocchini testified the robberies charged in this case were related to each other based on the similar methods used by the suspects.

FN7. We will discuss appellants' objections to Brocchini's expert testimony in section V, *post.*

"That they were all 24-hour convenience stores. The robberies occurred late at night, like between 11:30 at night and 3:30 in the morning. There was no customer ever in the business at the time of the robberies. The way they committed the robberies, the same in all of the robberies, meaning when they went in, a gunman always went to the clerk, and the other suspect would either stand at the door or get money or beer. The suspects in all of the robberies have the same, similar description. They're wearing the same, similar kind of clothing. They use a gun that's similar, we described, in all four robberies. [Lawrence] admitted that he did all four robberies, and he admitted he did it with the same person."

19

Detective Brocchini testified the facts showed the same perpetrators committed the robberies:

> "They have the same physical descriptions, same gun used, same clothing. In two of the robberies, they're wearing exact same clothing. And in the other two, they're wearing the exact same clothing.

> "The way they committed the robbery, like I said before, sometimes they do different jobs, meaning the taller subject might go to the clerk, but he'll also have the gun. And the shorter one will either stand guard or get something else. Or the shorter one will go to the clerk, and taller one would stand guard. That's not unusual. They take turns in robberies...."

Brocchini also addressed the witnesses' identifications of the robbery suspects-Mazloumi identified Jose's tattoo on his neck as similar to the tattoo displayed by the suspect in the Quick-Stop robbery; Niave identified Lawrence's tattoo, and identified Lawrence at the preliminary hearing and trial as the one of the Stop-and-Save robbers; Wisler identified Lawrence at the in-field showup shortly after the Standiford AM/PM robbery, and identified Jose from a photographic lineup and at the preliminary hearing and trial; Maria Santana identified Jose as the man who jumped off the roof, asked for a ride, and said he was running from the police; and Lawrence was found in the general vicinity as where Jose appeared at the Santana house.

Detective Brocchini testified the two robbers acted as a team when they were in the convenience stores: one man went to the counter and obtained the money from the clerk, the other man grabbed beers or cigarettes, and they met back at the door when they were finished. Each robbery lasted about one minute. Brocchini noted some of the robberies were separated by less than 30 minutes, testified they planned each robbery but "they probably planned it from the time they left one and they picked the next one. So not a lot of time." Based on his investigative experience, Brocchini testified that robbery crews consist of two or more people because it is more confusing for the victims to describe the suspects and the descriptions will be mixed up.

Brocchini testified the getaway driver's role was to supply a car that was either registered to someone else or stolen. The getaway driver usually selects the location and waits outside with the engine running for a quick departure. Based on Brocchini's investigative experience, the getaway driver is usually someone in authority. "He doesn't want to get his hands dirty. He doesn't want to go inside, but he wants to make sure it gets done, and he wants to get his cut. And then he drives them away to a location of safety." During the last robbery, the police actually saw the getaway vehicle-the white truck-waiting for the robbers to leave the Standiford AM/PM, the police saw the robbery suspects jump out of the truck, and they apprehended Willie as the driver, Lawrence was found nearby, and Jose turned up nearby at the Santanas' house.

Detective Brocchini also offered testimony as to the interaction of gangs with armed robberies, based on his prior training, experience, and knowledge about gangs gained while working in the gang unit. Brocchini testified to his opinion that the robberies in this case were committed to further gang activity by obtaining money or items which would probably be used to purchase guns, since gang members cannot buy guns through the usual channels. Brocchini had also seen situations where gang members commit robberies and use the money to pay rent on the gang house or pay the PG & E bill. Brocchini acknowledged the robbers in this case were more sophisticated than a transient trying to rob a store, but they were not very smart. However, Brocchini rejected the possibility that the armed robberies were "drugged-out, non thought activity."

Brocchini testified that every robbery committed by a gang member could be performed to further the gang's criminal activities, although he conceded that there could be circumstances where one gang member committed a robbery only to obtain cigarettes or food for himself. "We wouldn't be putting a gang enhancement on somebody that stole a pack of cigarettes from some guy or one cigarette. It might not be gang-related. It may be gang involved, a gang member that committed a crime, but it's not a charge that would be pursued."

In Brocchini's opinion, when a gang member steals beer or cigarettes, the act furthers subsequent criminal activity because that gang member has gained the confidence of the rest of the gang by performing the crime, and can also brag about it and increase his notoriety within the gang. Brocchini cited to the slang phrase which Jose used when the Santana family gave him a ride: "... [T]hat's actually what they call what you heard here, 'jale,' putting in work."

"You don't take a brand-new gang member on an armed robbery on the first day. You let him-you've got to see if you trust him. You work up to it. First you simply send him in, maybe he tosses the door, beer around. Didn't do the robbery, just goes out with it, but that's-you're teaching him. You're gaining his confidence. He's gaining yours. You're getting trust out of his use. You're seeing if he's going to rat if he gets caught on that little beer run. That furthers gang activity for the gang."

Once the gang member raises his stature within the gang, he does not have to commit the crimes anymore and he can send out the younger members to perform the crimes.

Brocchini acknowledged Lawrence was from San Jose, but testified Lawrence admitted being a Norteno since he was 13 years old, and explained gang members do not commit offenses with someone they did not trust. "You just don't hand them a gun. They wouldn't hand [Lawrence] a gun and say, Okay. Let's go do a robbery at AM/PM. So two Nortenos from Modesto trust one from San Jose, well, enough to hand them a gun and trust, him to go in and do a robbery with them and trust him not to rat on them. And so there's some schooling going on there." "That's how they gain trust with each other, especially when you have gang members from different sets of a gang coming together...."

Brocchini conceded that the majority of non-gang robberies are drug-related offenses, but testified that most "cranksters" are not Nortenos because the Nortenos have rules against members using methamphetamine. If a Norteno uses drugs, he will continue to be in the gang but will receive discipline for it. The large majority of Nortenos are Hispanic males between 15 and 30 years old.

*Expert Testimony on Gangs*

Detective Richard Delgado testified as the prosecution's gang expert and discussed his prior interactions with young gang members in the county jail. [FN8] He often talked with and interacted with them, and they discussed their activities in the gang as part of their bravado of being involved and gaining respect. Delgado testified the young gang members "[a]bsolutely" know members of their gang have engaged in criminal activities and know the history of their gang's activities.

FN8. We will discuss appellants' objections to Delgado's expert testimony in section IV, *post.*

Detective Delgado explained the Norteno gang had been in Northern California for decades and acted under the umbrella of the Nuestra Familia prison gang. "You can have a

Norteno from Ceres sharing the same philosophy with a Norteno from up at Pelican Bay or from San Ramon or Santa Rosa. They all have the same tattoos, same philosophy, listen to the same leadership, all look for the directions of to the top, which is Nuestra Familia. So it's all the same philosophy, all of the same beliefs, just different cities all referring to themselves as Nortenos, thus the Norteno gang."

As mentioned *ante,* Robert Gratton was one of the leaders of Nuestra Familia, and his son was often seen with Jose. Detective Delgado testified that Robert Gratton became concerned that young Nortenos were fighting among each other. Gratton was involved in Nuestra Family's production of a rap CD entitled "Generations of United Nortenos," also known as "GUN," performed by "Sir Dyno." The CD was distributed to the Norteno street gangs and directed them to unite as Nortenos instead of fighting within themselves, and direct all their attention against the rival Surenos.

"The CD was produced as a direct order from Nuestra Familia, which is the overseers of the whole Nortenos criminal street gang ... in every city within California. And it was an absolute direction from them that you are to cease fire, not commit violence on any of the Nortenos. You are to get along and unite.... you're to unite and put away all problems, all arguments between each other immediately and concentrate all your efforts on committing crimes and killing rival gang members because those are the real threats coming up."

Delgado testified the CD was distributed by North Star Records from Tracy, and Robert Gratton was the company's partner. The CD had been found in the homes of Norteno gang members all over Northern California, and the result was a decrease in violence within the Norteno gangs. The lyrics refer to "having a gun and robbing, putting the gun in people's face and basically watching them be terrorized and the thrill that you get from doing it, the adrenaline rush." [FN9] Delgado testified that in just a few months, Robert Gratton made $50,000 from distributing about 2,500 CDs.

FN9. On cross-examination, a defense attorney tried to show the "GUN" rap song was innocuous when compared to Johnny Cash's song, "Folsom Prison Blues," in which Mr. Cash sang: "I shot a man in Reno just to watch him die." Defense counsel asked whether Mr. Cash performed the song with the intent to incite others to murder people. Detective Delgado replied Mr. Cash, his songwriters, and/or his band did not have common identifying signs, symbols, or colors, or associate on a regular basis to commit crimes.

Delgado testified the Modesto Police Department used six criteria to determine if someone was a gang member: associate on a regular basis with gang members and associates; proclaims himself to be a gang member; identified as a gang member by two or more corroborating sources, such as a relative, another gang member, or a probation officer; wears, displays, or possesses physical evidence of gang membership such as clothing, tattoos, drawings, or photographs of other gang members; uses words, phrases, terms, hand signs known to be specifically associated with a gang; and identified in a judicial proceeding as a gang member. The police department requires a minimum of two criteria for someone to be considered a gang member. Delgado explained that as a result of anti-gang legislation, a lot of Norteno gang members have become "pretty savvy" and avoid wearing solid red and being "flamed out," and have toned down their colors to avoid attracting the attention of law enforcement officers.

Delgado testified there were at least 3,000 documented Nortenos in Stanislaus County, and over 10,000 in Northern California. The Surenos were the Nortenos' rivals. There were more Nortenos than Surenos in Stanislaus County, but the number of Surenos was increasing and nearly equal to the Nortenos.

Delgado testified the Norteno gangs had common signs and symbols, including the color red, demonstrated through clothing, hats, belts, bandanas; the letter "N" as displayed in jewelry; and the number 14, since "N" was the 14th letter of the alphabet, represented by one and four dots, or Roman numerals for 1, 4, and/or 14. The Nortenos also used the "Huelga Bird" symbol, originally used by Cesar Chavez's farm labor movement, and had twisted it to their own meaning as a gang symbol. Some Norteno tattoos depicted the bird with four feathers instead of the original design with five feathers. The Nortenos did not use the Huelga bird as just a common gang tattoo, but as a symbol that the gang member had done something very significant for the gang, and it was usually on high ranking gang members. A gang member with a Huelga bird would be asked by other gang members to justify the tattoo or face retribution.

Delgado testified there were several different sets of gangs under the Norteno umbrella in Modesto but "98 percent of them all get together. they're under one big association," and the various Norteno sets "all associate together." A gang member could move into another neighborhood and claim another Norteno set, but keep his tattoos from his prior clique. "It's all under the Norteno's umbrella. It's just different little subsets that all get along for the common cause for Nortenos." Delgado testified the Nuestra Familia prison leadership had been broken up through various prosecutions, and there was some fighting within the Norteno group to assume overall control and leadership. However, Norteno gangs were generally united and got along regardless of what area they were in.

The Norteno subsets in Stanislaus County included DSSM, Deep South Side Modesto; DSSN, Deep South Side Nortenos; DSSY, Deep South Side Youngsters; WSM, West Side Modesto; WSBZ, West Sidz Boyz; VMB, Vernon Block Nortenos; BRN, Bed Rock Nortenos; DMC, Dead Man's Curb; NSB, North Side Boyz; ESM, East Side Modesto; BWST, Barrio West Side Turlock; WCN, West Coast Nortenos; and WWR, Wicked West Riders. WCN operated in the southeast portion of Modesto, and WWR operated on the west side.

Detective Delgado testified that gang members earn respect within the gang by committing crimes, they gain more respect and fear by committing more serious crimes, and show "they're somebody to be reckoned with if you cross them." The primary activities of the Norteno gang in Stanislaus County included a great deal of assaults, such as drive-by shootings, hand-to-hand fights, and stabbings, robberies, auto thefts, drug sales, and burglaries.

Delgado testified to numerous predicate offenses committed by active members of the Norteno gangs in Stanislaus County, based on his personal knowledge and investigation of the offenses. Jose had four prior burglary convictions in February 1998, June 1998, October 1998, and March 2000. Willie had two prior burglary convictions, in May 2001 and November 2001. Vincent Gonzalez, a member of the West Side Modesto Nortenos, was convicted of felony assault with great bodily injury, and the substantive gang offense in December 2002, for stabbing a Sureno member. Juan Galvan, a member of the West Coast Nortenos, was convicted for possession of a controlled substance for sale in February 2003. Marty Johnson, a documented Norteno member, was convicted of car theft in May 2004. Albert Briseno, a member of the West Side Boyz, was convicted for carjacking and the substantive gang offense in March 2005. Albert's brother, Andrew, is a West Coast Norteno, and they both associate with the West Coast Nortenos and West Side Boyz.

Delgado testified all the appellants in this case had Norteno tattoos, and they had explained the meaning of these tattoos to law enforcement officers on prior occasions. On Willie's stomach, he had "BWSN," which Willie said meant "Barrio West Side Norteno." Also on his stomach, he had tattoos of "player" and "life," a common Norteno gangster code or saying. On Willie's back, he had "West Coast Trippin,' " and one dot on his right

hand and four dots on his left hand representing 14. On Willie's arm, he had "one" and "four," representing 14, "Brown Pride," which was an "old school" representation of Latinos, and the Huelga bird.

Delgado testified Jose had a tattoo of "WCN" prominently on the back of his head, and "CA" on his neck, representing West Coast Nortenos. Jose had "WCN" in large letters on his stomach. On the right side of his neck, he had "Bad Boy" under his ear, referring to his Norteno lifestyle. He had "Sinful thoughts" across his neck, which meant he was not leading the right kind of life. He had tattoos of "West Coast Nortenos" on his forearm, one dot on his left finger, and both WCN and WSM, for West Side Modesto.

Delgado testified Lawrence had "more significant tattoos," including a Mongolian warrior and "SJ" on his left lower arm, a large "B" on the right side of his chest, which Lawrence said meant Barrio East Side San Jose, a large "BES" across his stomach, which meant Barrio East Side, a large Huelga bird on his stomach, a "bumble bee" on the side of his neck, which he said meant "B" for Barrio East Side, and the letter "B" on the other side of his neck. He had tattoos on his legs of "B" for Barrio, "XIV" for 14, a Mongolion warrior, and the numbers one and four. Lawrence had lots of tattoo collages on his arms, with the numbers one and four.

Detective Delgado testified that he did not believe Jose's claims that he had dropped out of the gang. Delgado explained that a true dropout usually approaches law enforcement officers and debriefs them about their prior activities, and would refuse to be housed in custody with members of their former gang. The police seized photographs which depicted Jose with other Nortenos. In addition, Jose had been acquiring additional Norteno tattoos from his first contact with the police in 2003 to the time of his arrest in this case, he admittedly slashed a rival gang member, and he continued to associate with active members of the Norteno gang. The police contacted Jose about one month before his arrest in this case, and he was wearing a red hat, shirt, and shoes.

Detective Delgado testified about his investigation of Lawrence's background in San Jose, and determined Lawrence was an active and documented member of BES, Barrio East Side Norteno street gang in the White Road area of San Jose. There were 24 active members of BES. In April 2005, a San Jose police officer contacted Lawrence and asked what gang he was with, and Lawrence said he was with " 'BES, Barrio East Side,' " he was a Norteno, and he had been with the gang for four years. In May 2005, a San Jose officer contacted Lawrence while he was with other documented members of BES, and Lawrence again said he claimed Norte and BES.

Detective Delgado was present for Lawrence's postarrest interview, and noted that Lawrence described his partner, "Mike," having a tattoo with four dots, which indicated Norteno gang membership. Lawrence said he was a Northerner and claimed Barrio East Side, which was a validated gang in San Jose. Lawrence said he gave the robbery proceeds to a girl named "Cheena," she gave some of the money back to him, and that he got the money for everyone. Delgado testified Lawrence's statement was significant because it showed the robberies were committed to benefit the gang by giving back the robbery proceeds, but Delgado did not believe the other person's name was actually "Cheena" or that person was a woman. "I think it was [a] male ... probably a shot caller" and Lawrence could not snitch on that person or he would "really be dealt with."

"... [F]requently Norteno gang members, when they associate together and commit specific crimes, especially crimes like burglary and robberies, that they are directed to give the money to a higher up, who takes all the money and will disburse it out amongst the gang and use it by the gang. The persons who actually committed the crime sometimes will get no money at all, sometimes will get a kickdown, but the money itself was given to

somebody for to be spread out where it should be directed, whether it's buying weapons, buying narcotics, sending it up to prison to higher ranking members of the gang in prison or jail system."

Delgado explained that when the Nuestra Familia prison leadership was prosecuted and broken up, some of the "generals of Nuestra Family" had in excess of $50,000 and $60,000 on the books, which had been provided "by gang members all over California."

Detective Delgado testified Lawrence admitted he knew "Mug," who was actually Paul Lopez. Delgado explained that Paul Lopez was the brother of Jose and Willie. At the time of trial, Paul Lopez was in custody on another matter and was considered a "shot caller," someone who ran the gang in his custodial unit. During the investigation in this case, the police discovered photographs of Lawrence with Paul Lopez. When Willie was arrested, he was driving a white truck registered to Paul Lopez's wife. Lawrence had Willie's cell phone number in his cell phone. Delgado testified such contacts were significant because it established ongoing association among active Nortenos.

Detective Delgado was aware of Lawrence's repeated claim that he committed the robberies with "Mike," that "Vince" was driving the white truck, and that Lawrence never said he knew Jose or Willie, or that Willie was driving the truck. Delgado testified Lawrence was trying to be "a good soldier" and protect the other participants.

"... Frequently ... you get somebody that's going to confess about the whole thing, and he may confess and give up his partner, but he's going to use a different name, different description entirely to throw the police off."

I mean, it's one thing to confess to the police yourself, but you're not going to bring somebody else into it ... especially if you're a gang member, because once you snitch, you're no good, period. And you're not just no good like they don't want to associate with you anymore, you're no good as in there's a green light on you, meaning they're going to stab you, shank you, kill you, do something to pay you back for what you did to the gang."

Delgado explained it was "like a badge of courage" to take the fall and cover up for the other gang members involved in the crime. Lawrence was "being a good soldier. He didn't give up his partners. He took all of the blame himself. He didn't implicate anybody else like he's been trained to do." In such a situation, a gang member would "earn some stripes" for the benefit of the gang by keeping his fellow gang members on the street, "to continue to commit crimes ... they're still able to do crimes to raise money on the street, which will be in turn kicked back to you in jail or in prison to support you and your family while you're in custody."

Delgado testified Lawrence had numerous gang tattoos on his arms and stomach, and he asked Lawrence whether the intricate artwork was intended to cover up some of the gang tattoos. Lawrence replied the elaborate tattoos were not cover-ups and specifically explained the tattoos consisted of a collage of a one and four. Delgado noted that at the end of the interview, Lawrence repeatedly refused to be placed in protective custody, said he was an active member, and insisted placement with the Nortenos, which was contrary to any claim that he was a dropout. Delgado explained it would be a "great insult" to place an active gang member in protective custody since other gang members would assume that person had become an informant.

Delgado testified the police were able to obtain information from Lawrence's cell phone which consisted of photographs, sound bites, and videos of Lawrence hanging out with other Norteno members, displaying and wearing red bandanas, and flashing Norteno signs. In one photograph, Lawrence was "masking up" in a red bandana, showing his gang

tattoos, and posing as if he was about to commit a crime. Such a photograph was taken to brag to the other Nortenos. Another photograph depicted Lawrence holding a gun in a menacing manner, wearing a red bandana, and showing some of his tattoos, as if he were about to commit a robbery, which again demonstrated his practice of intimidation for the gang's benefit. There were photographs of Lawrence wearing red, and posing with Paul "Mug" Lopez, the brother of Jose and Willie and a documented Norteno, throwing gang signs and wearing gang colors. Delgado believed these images demonstrated his gang-banging lifestyle, and could be used to vouch for himself with other homeboys with other Norteno gangs.

Delgado testified that when Lawrence was arrested, shortly after the last robbery, he was wearing sweatpants that lacked belt loops, but he had a black canvas belt wrapped around his waist with the letter "N" on the belt buckle, signifying Nortenos. When Willie was arrested in the white truck, he was wearing a red shirt, which was significant because it represented the gang. When Jose was arrested the next day, he was wearing pants with a red band.

Delgado was also aware of Jose's claims that he was a dropout from the Nortenos, and testified his accumulation of tattoos contradicted that claim. Jose's records indicated he continued to add more Norteno tattoos since the time of his first field interview, even as he claimed to be a dropout. In March 2005, Jose admitted he acquired a black star tattoo for stabbing a rival Sureno at CYA, yet he had previously claimed to be a dropout. In addition, a dropout would not be allowed to commit crimes with other active Nortenos, as in this case.

Delgado testified all three appellants were active members of a Norteno gang at the time of the robberies. "[I]f somebody's merely an associate of a gang, they would not go on a robbery spree with another gang member or go out to commit auto thefts or burglaries with somebody. The gang would not allow somebody that was just a hanger-on. They need somebody who's trusted, jumped in, a fellow brother in the gang to do this."

As to Lawrence, Delgado's opinion was based on his prior contacts with the San Jose Police Department, his admitted gang membership, his admitted knowledge of his brothers' gang-banging activities, his admitting knowledge that other gang members were in prison for committing crimes, wearing gang colors, gang tattoos, and continued association with other active members of the Nortenos. As to Jose, Delgado's opinion was based on his long history of being involved with the Norteno gangs in Modesto, his admitted gang membership, his continued association with other Nortenos, despite his claims of being a dropout, his display of gang colors and symbols, and his black star tattoo for attacking a rival Sureno. As to Willie, Delgado's opinion was based on his association with other Nortenos, his prior admission of being a Norteno, and his involvement in the final robbery with two other Nortenos by driving the get-away car. Delgado testified Jose and Willie Torres had been involved in other gang crimes. Their older brother, Paul Lopez, had been a gang banger with the Nortenos for many years, he knew Lawrence's family in San Jose, he provided the vehicle for the last robbery, and he was a shot caller for the Norteno gang in jail.

"So based on all of those factors as well as the multiple crimes they're involved with in these cases, gives me that opinion that they had knowledge that the gang participates in crimes. Not only that, but, I'm sorry, several of their friends involved within the gangs, whether it's Wicked West Rid[ers] or WCN, have been previously convicted on several felony charges with felon predicate type of crimes."

Detective Delgado testified the appellants committed the offenses in this case to further the felonious activities of their gang. As to Jose and Lawrence, they committed the

robberies with other Nortenos, they used masks, showed red bandanas, and carried weapons. They worked as a team with each person having a specific job, and Willie had the specific job to drive the get-away car in the last robbery. "You've got people with weapons doing specific jobs all to benefit the gang, acting together." Delgado believed Willie had more history in the gang than Jose and Lawrence, and would be considered the OG, based on his role in driving the getaway vehicle, "making sure that the crime was committed correctly, parking down the street. In the long process, they were to go in with guns, with masks and commit these crimes, come running out to his car where he would make sure they got away."

Delgado explained appellants committed the robberies in this case to benefit their gang:

"[G]ang members typically, based on my experience, do not have legitimate jobs, so they rely on criminal activity, in this case robbery, to supply the money, alcohol, food, whatever it is to support themselves. They use the money to purchase weapons, so the money obtained in these robberies could have been used to purchase drugs, marijuana, weapons, and other things, pay rent, to benefit the gang. That's just one reason on how it benefits the gang.

"Another way it benefits the gang is the fear factor. Gangs operate on fear, intimidation and respect. They believe ... the more you fear me ... is the more you respect me.

"So by the [appellants] in this case, Jose Torres going in with a weapon, with a mask, the tremendous fear that that clerk or those clerks in that case and the victim inside who had money taken have to live with knowing that, if there is a gang member on the street, they're always going to cower down. They're always going to be fearful of the gang. [¶] ... [¶]

"... It benefits the gang in many ways, the fear, respect. People are going to fear Norteno gang members now. Articles will be in the newspaper that gang members went in and committed these crimes. They may quit work. I mean it's happened numerous times where I've investigated where clerks just quit. They don't want to deal with that anymore.

"The other benefit, obviously the cash, the beer, whatever proceeds they got benefit the entire gang because it's shared with the gang, it's prerequisite, any spoils you get from your crime."

Detective Delgado further testified to his opinion that appellants committed the robberies at the direction of the Norteno gang, and that the Nuestra Familia hierarchy had given specific directions to the various Norteno street gangs to unite as a gang, "which these individuals have done, unite as a gang. They have committed the crimes as set forth in that CD [distributed by Nuestra Familia at Gratton's direction], talking specifically to rob, to get your guns, to go out and rob, not once, but twice, and how your adrenaline needs to be pumping, how it's exciting to rob and accomplish that need."

Delgado conceded that a gang member could commit a crime for his own personal benefit rather than for the gang's benefit. In this case, however, appellants' actions during the robberies were in association with and promoted their gang, because they were active Norteno members clearly working as a team to plan, commit, and flee from the crimes together. Appellants "didn't just commit one robbery. It was active gang members committing robbery, after robbery, after robbery together, providing a vehicle by Paul Lopez to commit these robberies, a get-away driver." The robbers "dressed up in masks

and red bandannas representing the gang, that's all brought in to further the gang, to further the Norteno criminal street gang." Delgado explained these robberies clearly furthered the Norteno gang because "[i]t's for bravado. He's going to brag to all the homeboys, look, what I've done. Look how it's done, you guys do this. It further promotes the gang." "For them to commit more, to develop, you know, bravado, courage, hey, I've done one, we can do another, didn't get caught, let's do another one. Builds courage up in the gang as well." The money obtained from such robberies "all goes uphill" to higher ranking members of the gang.

Delgado cited Lawrence's postarrest interview, when he said he gave the robbery proceeds to "Cheena" and she gave him a cut, and compared the system to paying taxes to the gang. Delgado believed Lawrence's description was accurate except for the identity of the person who collected the money. Delgado explained that based on his knowledge of the Norteno gangs, when a Norteno commits a burglary or robbery, "he's required to give some of those products to somebody higher than him in charge, who in turn sells them for whatever money is put on books in the jail to higher ranking gang members. And some of it is sent up to the prison system. [¶] Now, in this case here, [Lawrence] committed robberies with some other Nortenos. [Lawrence] has got brothers in prison. So I don't doubt that he's sent money up to his brothers to support his brothers in prison. That's directive of the gang." While the money from these specific robberies may not have been used in such a manner, such a situation was "frequently what they do by committing robberies, burglaries, selling the merchandise to raise money to put on books. You can't put alcohol and cigarettes on books, but you can put cash on books."

"... [B]ased on my experience and based on what [Lawrence] was doing, they were definitely putting in some work, committing these robberies and giving the money to somebody. [¶] You don't go and commit this many robberies in locations where there's surveillance equipment where you can see it everywhere, masked, unmasked, just for the heck of it. You know you're going to get caught. You're putting in work. You're trying to be a good soldier."

Delgado testified that by giving back a portion of the robbery proceeds, the gang members keep the gang going. Gang members usually do not have legitimate jobs and instead rely upon these type of crimes to benefit the entire gang by sharing the proceeds with everyone.

"... It benefits the gang whether it's purchasing weapons, drugs, to re-up on drugs to sell or make more money to finance Nortenos parties, drugs, alcohol at these parties, pays their rent, they put money on books of their family members who are gangsters, friends who are gangsters. You're required to support your homeboys who are in custody."

In addition, the gang member's use of any type of force or fear on the victims benefits the gang and increases the Nortenos' reputation as a group to be feared.

Delgado further explained the multiple robberies were committed for the benefit of the Nortenos because they were committed by two documented Nortenos, working together as a team, with another Norteno driving the getaway car for the last robbery. They did not commit "just one simple robbery, but five total robberies together, associating together, and committing the robberies to benefit, to support the Norteno gang." The robbers did not just wear solid black, but were wearing "kind of tools of the trade and items of clothing to represent their gang," including red bandanas and Lawrence's "N" belt. "[T]hey're wearing colors to represent their gang. They were committing these robberies as active gang members." The robbers did not keep the robbery proceeds for themselves, but it was shared with other members of the gang, "so thus committing these crimes together, they benefitted the gang."

"[C]learly when you commit a robbery with another gang member and you planned it out, one's driving and one's watching the door and one's got the gun on the clerk, it's clearly that they're in furtherance of and they're assisting each other during the commission of the crime."

On cross-examination, defense counsel attempted to show that Delgado's expert testimony was simply a repetition of a report prepared by another officer in an unrelated gang case involving different offenses and participants. Delgado disputed that his testimony was similar to the report, aside from summarizing the Nortenos' activities in Stanislaus County, and that the suspects in both cases committed their offenses for the benefit of their gang.

### Defense Evidence

Jose, Willie and Lawrence did not testify. Jose did not call any defense witnesses. Willie called Daniel Vasquez as a defense witness. Vasquez was a retired warden with the California Department of Corrections (CDC), and testified as to his knowledge of gang activities and Willie's prior criminal activities. Willie had been in CDC and received a Level I placement, which meant there was no gang validation information for him of any sort. He was released on parole and received minimal supervision, and had been on parole for over two years when he was arrested in this case.

Vasquez testified there was no Norteno street gang, but there were individuals who described themselves as Nortenos from small neighborhood gangs. Instead, Norteno was merely a geographical identification. Vasquez testified there were two validated gangs within CDC which were from Northern California: Nuestra Familia and Northern Structure. Vasquez testified it was impossible for Nuestra Familia to control the thousands of street gang members from within the prisons.

In Vasquez's opinion, the offenses in this case were not committed to benefit the Norteno street gang. There was "no Norteno criminal street gang. There's no known leader. It's a large number of people who make up people who identify as Norteno, and it just doesn't exist." Vasquez conceded the offenses could have been committed to benefit a small neighborhood gang.

On cross-examination, Vasquez conceded the Norteno gang has more than three members, common signs and symbols of "N," "14," and one and four dots, had been involved in criminal activities, and members of that gang have been convicted of burglaries, robberies, grand theft, auto theft, carjacking, possession of drugs for sale, and felonious assault. Vasquez was aware of validated Norteno subsets, and there were hundreds of different sets of smaller Norteno gangs in Northern California, but there was no single ongoing organization known as the Norteno criminal street gang. Vasquez conceded each set would meet the statutory definition of a criminal street gang, but insisted there was not a single Norteno prison or street gang with 20,000 members. Vasquez testified the only validated northern gangs in CDC were Nuestra Familia and Northern Structure. Vasquez also conceded all three appellants had previously claimed Norteno membership, they had extensive Norteno tattoos, and they were depicted in photographs with other gang members and throwing gang signs.

Lawrence called Gary Zimmerman as a defense witness. Zimmerman was a psychologist with CDC and the parole department, and also had a private psychology practice. Zimmerman reviewed the transcript of Lawrence's postarrest interview, and also spoke to Lawrence about his condition during that interview. Zimmerman did not watch the videotape of the interview.

Zimmerman testified that Lawrence said he had been using PCP, methamphetamine, and alcohol in the days leading to his arrest, and he had been up for a couple of weeks. Lawrence clarified, however, he had not used PCP for a day and a half before the arrest. Lawrence said he was feeling the effects of the drugs during the postarrest interview, based on his rambling speech and inability to sit still. Zimmerman testified to his opinion that Lawrence was a heavy drug user and addicted to drugs at the time of his arrest. Lawrence admittedly dealt drugs to support his use, bought drugs from other people, missed work because of his drug use, and lost his only job because of repeated drug use at work. Lawrence's family had repeatedly urged him to stop using drugs and sent him to a drug treatment program, but he failed to comply with the program. He was also sent to drug diversion as part of a criminal case, but he failed to attend and failed a drug test.

On cross-examination, Zimmerman conceded he did not have any evidence whether Lawrence was under the influence of narcotics during the postarrest interview, aside from Lawrence's own statements about his condition. Lawrence told Zimmerman that he wanted to get home by robbing the store, he ran when he saw the police, and he was a gang member and did not feel he could beat the enhancements.

Lawrence also called his mother, Patricia, as a witness. She testified that Lawrence lived at the family home in San Jose, and other family members lived in Oakdale. Her oldest son had been to prison a few times. She asked Lawrence to move out and live with his brother, Robert, because Lawrence was using drugs. Robert had previously been involved in gangs but had never been in prison. He turned away from that lifestyle, and was married with a family and had a job. Lawrence enrolled in a drug treatment program but never finished it. Robert asked Lawrence to leave the house because of his drug use. Patricia knew that "Mugs" was a friend of her older sons. Patricia admitted Lawrence's uncles and brothers had been involved in gangs, but claimed he was too young to understand.

Patricia testified that in May 2005, Lawrence was living with her and working, but they had a fight about whether he could go to a party in Modesto. Somebody picked up Lawrence, he left San Jose, and they never saw him again before his arrest. She did not believe that he intended to stay with their family in the area. About one week after he left, Lawrence called her from Modesto and said that someone was going to stop by her house and pick up his clothes. Patricia refused and ordered him back to San Jose because they were planning a family trip to Disneyland. Patricia testified she could "tell by his voice on the phone" that he was using methamphetamine, and she knew he was heavily involved with drugs again.

*Closing Arguments and Jury Questions* [FN10]

FN10. The closing arguments and jury questions are included here because appellants raise numerous issues of ineffective assistance and court error based on these issues.

In closing argument, the prosecutor, Mr. Maner, summarized the evidence which supported the charges as to each appellant, and asserted the surveillance videotapes from the stores supported each robbery count-that Jose and Lawrence committed the robberies and switched roles between the robberies. As for Lawrence's postarrest statements, the prosecutor noted that Lawrence admitted he committed count I, and said he gave the money to "Cheena" and she gave some back to him, but "we're not exactly sure who they are." As to count II, the prosecutor noted that Lawrence also admitted committing that offense, and "that he took the money and he fled with his crime partner, who the evidence shows was Jose Torres," and he admitted again turning the money over to someone and getting some back. As to counts III and IV, the prosecutor cited to the surveillance videotape as showing that Lawrence and Jose "both had a gun in commission of that crime," that both robbers walked into the store together, and the "[e]vidence shows" that Lawrence was the man with the mask, and "[t]he evidence will show[ ]" that Jose wore the hat and red bandana. The prosecutor discussed the last robbery and the officers' observations of the white truck waiting near the store, their attempted chase of the two suspects on the canal bank, and the apprehension of Lawrence in a nearby backyard, Jose's appearance on the roof of a nearby house, and the discovery of Willie as the driver of the white truck.

The prosecutor argued Lawrence admitted his culpability during his telephone conversation with his father, particularly when he told his father that he did it " with my homies from out here.' " The prosecutor argued Lawrence's statement to his father was significant because he was from San Jose while the other two defendants were involved with Stanislaus County gangs. "So [Lawrence] is saying, 'I did it with my homies from out here,' is a probative piece of evidence."

The prosecutor also addressed Lawrence's postarrest admissions to the officers that he committed the four convenience store robberies. "And each of these defendants in these robberies are identified as being the same people as the ones that were in court from a large body of evidence." The prosecutor cited the identification evidence from the robbery victims and witnesses, based on their faces, physical appearance, and distinctive tattoos.

The prosecutor turned to the elements and evidence as to the gang allegations, and urged the jury to listen to the court's instructions on those allegations. The prosecutor cited to the extensive evidence as to each appellant's active membership and involvement in the Norteno gangs. The prosecutor argued the evidence established that appellants were gang members who acted as a team in committing the robberies. The prosecutor asserted appellants committed the robberies for the benefit of the gang: "We heard [Lawrence] talking about how he shared their money. We have evidence [Willie] was the get-away driver and was helping direct this activity."

Lawrence's defense attorney, Mr. Wentz, conceded that the surveillance videotapes made it "pretty clear" that Lawrence and one of the Torres brothers was involved in the four convenience store robberies, and instead asked the jury to focus on whether the prosecution met the burden of proof on the gang offense and enhancements. Counsel argued there was no evidence these specific robberies were committed for the benefit of

any particular gang, and cited to the testimony of Willie's defense witness, Vasquez, that there was no particular Norteno gang. Counsel argued the robberies were not as sophisticated as claimed by the prosecution because they were not wearing masks for the some of the robberies even though all the stores had surveillance camera. Counsel also argued that Lawrence had a "horrendous drug problem," suggested Lawrence appeared "a little loony" and did not make sense during his postarrest interview with the officers, and cited to Dr. Zimmerman's testimony about his drug addiction.

Jose's attorney, Mr. Yeoman, challenged the prosecution's evidence as to the identity of the robbery suspects as to each count. Counsel attacked the reliability and memory of all the victims and witnesses when they described and allegedly identified Jose as one of the suspects. As to count I, the store clerk was "obviously very scared" and focused on the gun, it "wasn't even able to give a very good description" of the suspects, and "it is not until almost one year later that she identifies" Jose as the gunman. Counsel attacked the testimony of the clerk in count II, because he was not able to describe the person who was standing at the door wearing mask, as Lawrence committed the actual robbery. In addition, the clerk thought the robbers left in the Jeep Cherokee instead of the older model truck which the prosecution relied upon. "So the whole premise of the case against [Jose] on that second robbery is that, well, because he must have done these other three robberies, he must have been that person that's standing at the doorway."

Jose's counsel turned to counts III and IV, and that the prosecution's case against Jose was based on the store clerk's identification of only part of a tattoo, but the clerk could not identify anyone by their face. As to the last robbery, the store clerk identified Jose, but counsel argued that identification was suspect because the clerk was not sure if Jose's tattoos were the same as the suspect's tattoos. The witness in the store also identified Jose but admitted she was very nervous and trying not to look at the suspect.

"... So we don't have a lot of identifications where somone's completely looking and ascertaining what's going on around them. These are people that are also under a lot of stress, and sometimes you miss things when you're under a lot of stress."

Jose's counsel acknowledged that Maria Santana identified Jose as the man who jumped off the roof, but argued that she failed to identify Jose from a photographic lineup shortly after the incident, and did not identify him until almost a year later. "Again, just common sense, your memory is not going to be fresher the longer you wait."

Jose's counsel wondered why Paul Lopez, the owner of the white truck who was depicted in Lawrence's cell phone photographs, or the other people in those photographs, were not part of the investigation or included within the photographic lineups shown to the victims and witnesses and queried: "[D]oesn't it make it suspicious they hone in on [Jose]? they're not even interested in looking at the owner of the truck." Counsel also attacked the lack of any evidence that a real gun was used for all the robberies and argued the firearm enhancements were subject to reasonable doubt.

Counsel also attacked the evidence as to the gang allegations, and argued there were "some problems" with it.

"... A lot of it is based on what [Lawrence] says in the interview. Now, the testimony was that he is fairly honest. That is ... the stuff he says about his role in

the crimes is honest, and the stuff that is not about his role in the crimes, it's dishonest. Well, being fairly honest is like being fairly pregnant. You either are honest or you're not. Right there, that's not reliable. That proof they have there was actually money exchanging hands and testimony by [the] gang expert that particularly gang members transfer money from proceeds of the crimes they commit, but we don't have anybody actually saying that they watched any of these three individuals pass money to anyone else. We don't see any of these transfers. We don't see these notes from the prison gangs. We don't see notes from higher-ups directing them to commit these crimes."

Jose's attorney argued there was no evidence the robberies were committed to benefit a gang because the robbers did nothing during the crimes to show the clerks the offenses were gang-related, and disputed the prosecution's assertion the robberies were sophisticated gang crimes.

Willie's attorney, Mr. Baker, reminded the jury that Willie was only charged with being the getaway driver for count V, the last robbery. Counsel argued Willie was only arrested because he was driving his brother's car in the area that night, and there was no evidence that he aided and abetted the last robbery. Counsel argued Willie could have been an accomplice after the fact, if the robbers called him for a ride after the crimes and he did not know what had happened, but the prosecution did not charge him with that offense. Counsel argued there was reasonable doubt as to whether Willie dropped off the suspects at the store, knew what they were going to do, and waited to pick them up. Counsel agreed with the other defense attorneys that the more serious issues were based on the gang allegations, reviewed the difference between the substantive gang offense and the gang enhancement, and argued there was no evidence Willie willfully assisted any gang when he was driving in the area.

In rebuttal, the prosecutor reviewed the elements for the gang enhancements, argued the evidence supported the enhancement, and attacked Vasquez's testimony that there was no Norteno gang.

During the deliberations, the jury requested to see the surveillance videotapes from all the robberies, and the testimony of prosecution witness Maria Santana, and defense witnesses Gary Zimmerman, and Daniel Vasquez. The jury requested to see the surveillance videotape for count II, the Modesto Stop-and-Save with Adrian Niave, and the "personal robbery" of Mazloumi, as charged in count IV. The jury also asked several questions about the instructions on the gang enhancements. The jury advised the court it could not reach a verdict for count IV, then asked to see the videotape for the "personal robbery of the store clerk giving his wallet."

(Lodged Doc. No. 4, Opinion, at 3-59.)

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

33

529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations

of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the

Tulare County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C.

§ 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484,

1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v.

Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct. 1114 (1997),

overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding

AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed

after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the

state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that

contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are

materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v.

Payton, 544 U.S. 133,  141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06

(2000).  A state court decision will involve an "unreasonable application of" federal law only if it is

"objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537

U.S. 19, 24-25 (2002) (per curiam).  "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." <u>Lockyer</u>, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." <u>Id.</u> (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. <u>See</u> <u>Lambert v. Blodgett</u>, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.    <u>Ineffective Assistance of Counsel</u>

Petitioner claims that trial counsel violated his Sixth Amendment right to effective counsel because he failed to object to the admission of a non-testifying co-defendant's statement.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's

alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

Petitioner presented this claim to the Fifth District Court of Appeal and the claim was denied in a reasoned decision. (Lodged Doc. No. 4, Opinion, at 61-80.) The California Supreme Court thereafter summarily denied the claim. (Lodged Doc. No. 6.) This Court presumes the California Supreme Court adopted the reasoning of the Court of Appeal. Ylst v. Nunnemaker, 501 U.S. at 803-804.

The Court of Appeal properly identified the correct standard of review under Strickland and concluded that the entirety of the record suggested a tactical reason why defense counsel did

not object to Mejia's testimony that his accomplice was "Mike" and denial that Petitioner was involved in the robberies.  The Court found that, "Given the overwhelming direct and circumstantial evidence against Jose and Willie, both defense attorneys may have believed that Lawrence's statements, along with the attacks upon the reliability of the eyewitness identifications, offered their only opportunity to raise a reasonable doubt on the robbery charges." (Lodged Doc. No. 4, Opinion, at 72.)  During closing argument, Petitioner's counsel implicitly used Lawrence's testimony to argue that the eyewitness identifications were faulty, the police investigation was not complete, and there was a possibility that someone else was involved.  (RT 1529-1536.)  Furthermore, the jury was  instructed that there was evidence admitted for a limited purpose and such evidence could only be considered for that purpose alone.  More specifically, the court instructed that the jury could only consider Mejia's statements as evidence against him, and not against any other defendant.  (RT 1603.)  Juries are presumed to follow cautionary instructions and Petitioner has not presented any evidence that the jurors failed to do so in this instance.  Richardson v. Marsh, 481 U.S. 200, 211 (1987); Fields v. Brown, 503 F.3d 755, 782 (9th Cir. 2007) (en banc); Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir. 2007).  In light of these circumstances, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).

D.    Trial Court's Failure to Instruct on Accomplice Testimony

Petitioner contends that the trial court erred by failing to instruct on accomplice testimony because Lawrence was an accomplice as a matter of law.

Where the alleged error is the failure to give an instruction, the burden on the petitioner is "especially heavy."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977); Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997); Jeffries v. Blodgett, 5 F.3d 1180, 1195 (9th Cir. 1993).  A claim that the trial court erred by omitting an instruction is only cognizable if the omission so infected the entire trial that the resulting conviction violated due process.  Estelle v. McGuire, 502 U.S. 62, 73 (1991); Cupp v. Naughten, 414 U.S. 141, 147 (1973).  An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.  Henderson v. Kibbe, 431 U.S. at 155.  The significance of the omitted instruction is evaluated by a comparison with the instructions

that were given. Id. at 156; Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir.2001). Petitioner must establish "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990).

As an initial matter, corroboration of an accomplice is not required under the Constitution. See United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions.); Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) ("[a]s a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or substantial on its face,' [Section 1111] is not required by the Constitution or federal law".) (Citations omitted).

In any event, the Court of Appeal's conclusion that overwhelming evidence supported the jury's finding of guilt was reasonable given the following:

> [T]he corroborative evidence included the eyewitness descriptions and identifications of Jose, the surveillance videotapes, Jose's inculpatory statements to his family, the evidence seized at the time of Jose's arrest, the witnesses' observation of the older white Chevrolet truck outside the Riverbank AM/PM store during the first robbery, the officers' observations of a similar white pickup truck outside the Standiford AM/PM store during the last robbery, Willie's presence in that truck shortly after the last robbery, the departure of the two suspects from the back of the white truck and their escape down the canal bank during the police pursuit, the discovery of the cigarette cartons on the canal bank, Lawrence's arrest in the backyard adjacent to the canal bank, the discovery of the mask and gun in that backyard, Jose's arrival from the roof of the nearby Santanas' house, and Jose's statements to the Santanas and his own family.

(Lodged Doc. No. 4, Opinion, at 82-83.) Thus, the failure to give accomplice instructions was not erroneous, and even if so, any error was harmless. There is simply no showing that the omitted instruction had a substantial and injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Thus, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

E.    Ineffective Assistance Counsel - Failure Object to Expert Opinion Testimony of Detectives

Petitioner contends that trial counsel was ineffective for failing to object to the expert opinion testimony of Detectives Brocchini and Delgado.

Petitioner presented this claim on direct appeal to the California Court of Appeal and California Supreme Court.  Because the California Supreme Court's opinion is summary in nature, however, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion.  See Ylst v. Nunnemaker, 501 U.S. at 804-05 & n. 3.

As previously discussed, ineffective assistance of counsel claims are governed by Strickland v. Washington, 466 U.S. 668, and a petitioner must demonstrate that (1) counsel's performance was "deficient," i.e. his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-688, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.  Id. at 691-694.  In order to establish ineffectiveness based on a failure to object, the petitioner must demonstrate that the objection would probably have produced a different result in the trial.  United States v. Quintera-Barraza, 57 F.3d 836, 841 (9th Cir. 1995); see also United States ex rel. Link v. Lane, 811 F.2d 1166, 1170 (7th Cir. 1987); Landry v. Lynaugh, 844 F.2d 1117, 1120 (5th Cir. 1988).  There can be no prejudice if there is no legally sound argument to object to the exclusion of the evidence.  Id.

Under California Evidence Code section 801:

> If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
>
> (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and
>
> (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion.

Expert testimony regarding the attributes of gang membership is admissible so long as the probative value in establishing motive, intent, or identity outweighs the potential inflammatory or prejudicial effect of such evidence.  People v. Williams, 16 Cal.4th 153 (1997); People v. Gardeley, 14 Cal.4th 605, 617 (1996).

Petitioner was charged with participation in a criminal street gang pursuant to California Penal Code section 186.22(a), and a gang enhancement pursuant to section 186.22(b)(1) which states:

> (a) Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years.

> (b)(1) Except as provided in paragraphs (4) and (5), any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted . . . .

Because Petitioner was charged with criminal street allegations and expert testimony was properly admitted under California law to prove such charge, any objection by defense counsel would have been futile and counsel could not have been ineffective. Quintera-Barraza, 57 F.3d at 841. Accordingly, there is no showing that the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

In addition, defense counsel was not ineffective for failing to object to Detective Brocchini's testimony because his testimony was properly admitted under California law. Detective Brocchini was the chief investigative officer and testified as an expert on robbery. He provided the jury with testimony regarding the similarities between the robberies in this case which was clearly relevant "to tie together the multiple robberies as part of a common plan instead of isolated incidents throughout Stanislaus County." (Lodged Doc. No. 4, Opinion, at 116-117.) This testimony was proper to assist the jury in determining whether the robberies were committed by the same suspects and to benefit the Norteno gang. Detective Brocchini never said that the robberies were committed by Petitioner and co-defendant Lawrence. It is certainly reasonable to conclude, as the Court of Appeal did, that counsel could have very likely made a tactical decision to refrain from objecting in an attempt to avoid drawing the jury's attention to such testimony. In sum, there is no showing that counsel rendered ineffective assistance.

In any event, even if it is assumed that counsel's failure to object amounted to deficient performance, there can be no showing of prejudice "given the overwhelming nature of the eyewitness testimony and the gang evidence." The Court of Appeal properly pointed out:

> To the extent that Brocchini's gang testimony may have been inappropriate, Detective Delgado properly testified as the prosecution's gang expert, addressed the same issues which Brocchini briefly touched upon, and offered additional expertise into the nature and practices of the Norteno gang in Stanislaus County and the manner in which robberies are committed to financially benefit the gang.

(Lodged Doc. No. 4, Opinion, at 119.)

Thus, even if counsel raised a successful objection, there is not a reasonable likelihood that Petitioner would have received a more favorable verdict, and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

F.      Insufficient Evidence to Support Gang Conviction and Gang Enhancement

Petitioner contends that there was insufficient evidence to support the gang conviction and enhancement, and his convictions therefore violated his due process rights under the Sixth and Fourteenth Amendments.

The California Court of Appeal issued the last reasoned decision and denied the claim finding:

> [T]he entirety of the record contains overwhelming evidence to satisfy the specific intent element. The prosecution introduced a mountain of evidence as to each appellants' active membership in the Norteno gang, their knowledge and involvement in the Nortenos' criminal activities, and refuted their claims that they were dropouts, based on the timing and appearance of various gang tattoos on their bodies, and their regular association with other active Norteno members who had been or were being arrested for gang-related offenses. While Lawrence was from San Jose, and Jose and Willie lived in Stanislaus County, the prosecution linked the appellants together since Lawrence admitted that he knew their older brother, Paul "Mug" Lopes, a family friend who was deeply involved in Norteno activities. The older model white Chevrolet, which the officers chased after the final robbery, and appeared consistent with the getaway vehicle used after the first robbery, was registered to Lopez's wife. Jose and Lawrence displayed Norteno signs and symbols during the robberies-the use and/or display of red handkerchiefs, the "N" belt buckle, and their clearly visible gang tattoos-and they used a getaway car linked to an important player in the Norteno gang, and driven by one of his younger brothers.
>
> As set forth in section IV, ante, Detective Delgado properly testified to his opinion that the robberies were committed to benefit the Norteno gang, rather than

41

simply generic robberies to benefit the individual suspects.  Delgado relied upon the revealing statements made by Lawrence during his postarrest interview.  While Lawrence steadfastly denied that he knew Jose or Willie, or that he knew any of Mug's brothers, he also stated that he never kept any of the cash or merchandise stolen from the convenience stores, and instead turned everything over to a third party, who gave some of the money back to him.  When Jose arrived at the Santantas' house via their roof, he asked for a ride and used a slang Spanish word and said he did a "jale," which meant he did "a job."  Moreover, Jose was angry that his girlfriend's consent to search of her house after his arrest because the police found gang-related materials there, and admonished her not to send any gang photographs to the jail.

Detective Delgado relied upon this evidence and explained, based on his prior investigations and research into gang cases, that the appellants were doing a job for their Norteno gang to reap money from the stores and turn in the proceeds to their handlers who were already in jail.  Delgado did not simply rely on rumor or speculation, but offered testimony based on his extensive investigations into the robberies, the facts adduced from that investigation, and his prior interviews with robbers and gang members who explained the Norteno practice of using lower-level gang members to finance their activities.

(Lodged Doc. No. 4, Opinion, at 131-132.)

The law on insufficiency of the evidence claim is clearly established.  The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597 (1981).

The Court of Appeal expressly followed the Jackson standard in finding there was sufficient evidence to support the gang conviction and enhancement, by citing People v. Johnson, 26 Cal.3d 557, 575-578 (1980).  (Id. at 124-132.)  The appellate court's conclusion was

42

reasonable given the evidence presented at trial, including the fact that Petitioner wore a red

bandanna during the commission of three of the robberies, his active membership in the Norteno

gang, his association with other active gang members, gang-related tattoos and signs, statements

by Petitioner's co-defendants, and expert testimony showing Petitioner collaborated with the other

two gang members to commit robberies to for the benefit of the Norteno gang.

G.    Trial Court's Response to Jury's Questions Regarding The Gang Evidence

Petitioner claims his federal constitutional rights were violated by the trial court's response

to the jury's questions during deliberations which referred them back to the previously given

instructions.  Petitioner's claim is based on the jury's request for clarification of the gang

allegations.

1.    Factual Background

The trial court instructed the jury with CALCRIM 1400-which defined active participation

in a criminal gang and CALCRIM 1401-which defined the gang enhancements.

As read to the jury CALCRIM 1400 provided:

> Defendants are charged in Count VII with participating in a criminal street
> gang.  To prove defendant is guilty of this crime, [the] People must prove, No. 1,
> defendant actively participated in a criminal street gang; two, when the defendant
> participated in the gang, he knew that members of the gang engaged in or have
> engaged in [a pattern of] criminal gang activity; No. 3, further [sic] willfully
> assisted, furthered, []or promoted felonious criminal conduct by members of the
> gang.
>
> Active participation' means involvement with a criminal street gang in a way
> that is more than passive or in name only.
>
> The People do not have to prove defendant devoted all or a substantial part
> of his time or effort to the gang or that was an actual member of the gang.
>
> A criminal street gang is any ongoing organization, association or group of
> three or more persons, whether formal or informal, NO. 1., that has a common
> name or common identifying sign or symbol; No. 2, that has [as] one or more of its
> primary activities the commission of ... [robbery, burglary, grand theft, auto theft,
> possession of methamphetamine for sale, or carjacking]; and, three, whose members
> were acting, whether acting alone or together, engaged or have engaged in a
> pattern of criminal gang activity.
>
> In order to qualify as primary activity, the crime must be one of the group's
> chief or principal activities rather than occasional act committed by one or more
> persons who happen to be members of the group."

1   (Lodged Doc. NO. 4, Opinion, at 133-134.)

2        CALCRIM 1401 instructed the jury as follows:

3            "If you find the defendants Jose Torres and Lawrence Mejia guilty of the
        crimes charged in Count I through V, Willie Torees, Count V or Jose Torres in
4        Count VI, you must then decide whether for each crime [the] People have proved
        the additional allegation that the defendant committed that crime for benefit of, at
5        the direction of or in association with the criminal street gang.  You must decide
        whether the People have proved this allegation for each crime and return a separate
6        finding for each crime.

7            "To prove this allegation, [the] People must prove, NO. 1, the defendant
        committed the crime for the benefit, at the direction of or in association with a
8        criminal street gang; and, No. 2, the defendant intended to assist, further or
        promote criminal conduct by gang members."

9

10  (Id. at 134.)

11       As explained by the state appellate court, during deliberations the jury send several notes

12  and the trial court responded to each question in writing.

13       The jury's initial notes requested to hear testimony and watch the robbery videotapes.  The

14  jury's other notes, however, addressed the gang instructions.  The jury requested the court "to tell

15  us if the predicate act must be met to meet criminal street gang definition."  The court wrote on the

16  jury's note: "Please refer to jury instruction 1400."

17       Next, the jury asked: "Is 1400 the same as Penal Code [section] 186.22A, and if not, what

18  is the difference?"  The court wrote back: "For both questions: can you please be more specific in

19  your question(s)?"

20       The jury's next note stated:

21            "We need clarification on 1401.  Part I the defendant committed the crime ... in
        association with a criminal street gang.  Does this mean association other than
22        during the crime or only during the time of the crime? [¶] Also, how many people
        are required to be considered 'associating[?]'"
23

24  The court wrote back on the note: "For both questions: please refer to the jury instructions with

25  which you have been provided."

26       The jury next asked: "To commit the crime in association with a criminal street gang does

27  it only have to have two people present during the crime?"  The court wrote back: "Please refer to

28  the jury instructions regarding gangs."

1  (Id. at 134-135.)

2       2.    Legal Standard

3       A challenge to a jury instruction solely as an error under state law does not state a claim

4  cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

5  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

6  ailing instruction by itself so infected the entire trial that the resulting conviction violates due

7  process.  Id. at 72.  The trial court has "wide discretion" in instructing and responding to the jury's

8  questions.  Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003).  "When a jury makes explicit its

9  difficulties, a trial judge should clear them away with concrete accuracy."  Bollenbach v. United

10  States, 326 U.S. 607, 612-613 (1946).  Under California law, when "'the original instructions are

11  themselves full and complete, the court has discretion under section 1138 to determine what

12  additional explanations are sufficient to satisfy the jury's request for information. [Citation.]

13  Indeed, comments diverging from the standards are often risky. [Citation.]' People v. Beardslee

14  (1991) 53 Cal.3d at p.97; People v. Smithee, supra, 20 Cal.4th at p.985.)" (Lodged Doc. No. 4,

15  Opinion, at 136.)  If the original instructions to the jury provide the correct legal principle, the trial

16  judge's later reference to such instruction is sufficient to pass constitutional muster.  Weeks v.

17  Angelone, 528 U.S. 225, 234 (2000).  In addition, just as the jury is presumed to follow all

18  instructions, it is likewise presumed to understand and follow the judge's answer to a question.  Id.

19       3.    Analysis

20       The trial court's response to the jury's question properly directed them to the adequate

21  instructions addressing its concerns.[1]  Although the Court of Appeal pointed out that the trial court

22  could have offered more clarification with regard to the predicate acts, any error was harmless

23  because such evidence was not presented to the jury.  Therefore, there can be now showing the

24  trial court's response so infected the entire trial that the resulting conviction violates due process.

25  With regard to the other questions, the trial court properly referred the jury to CALCRIM No.

26  1400 defining a criminal street gang as "ongoing organization, association or group of three ore

27  _____

28       [1] In fact, Petitioner has never argued that the CALCRIM instructions were incorrect statements of the
applicable legal principles.

more persons, whether formal or informal,..." Thus, the trial court provided the jury with the

necessary tools to eliminate their confusion, and the Court of Appeal did not unreasonably apply

clearly established federal law.

H.    Trial Court Erred in Refusing to Bifurcate Gang Enhancement and Gang Charge

Petitioner contends that the trial court violated his rights to due process and a fair trial by

refusing to bifurcate the gang evidence.

1.    Background

Prior to trial, Petitioner's co-defendant Willie filed a motion to bifurcate the gang

enhancement from the substantive gang offense in which Petitioner joined.  After a hearing, the

trial court denied the motion stating:

> It clearly is discretionary to the Court to bifurcate or not, and it is certainly an issue
> for the jury to decide whether it's gang related or not, and I do feel the gang
> evidence is relevant on the issue of motive. [¶] So in that regard, its probative value
> outweighs any prejudice it may have.  So motion to bifurcate, then, is denied.

(RT 17.)

2.    Legal Standard

This Court's review is to determine whether the trial court's decision not to bifurcate the

gang enhancement allegation resulted in a denial of the prisoner's due process rights.  Featherstone

v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) ("The simultaneous trial of more than one offense

must actually render petitioner's state trial fundamentally unfair and hence, violative of due process

before relief pursuant to 28 U.S.C. § 2254 would be appropriate." (internal quotation marks and

citation omitted).  The United States Supreme Court has held that bifurcation is not compelled as a

matter of constitutional law.  Spencer v. Texas, 385 U.S. 554, 568 (1967).  Petitioner bears the

burden of demonstrating actual prejudice from joinder of the allegations.  Davis v. Woodford, 384

F.3d 628, 639 (9th Cir. 2004).  "The requisite level of prejudice is reached only 'if the

impermissible joinder had a substantial and injurious effect or influence in determining the jury's

verdict.'" Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2001).  In determining the level of

prejudice it is relevant to focus on the cross-admissibility of evidence and the danger of "spillover"

from one charge to another.  Id.; Bean v. Calderon, 163 F.3d 1073, 1084 (9th Cir. 1998).

3.     Analysis

The California Court of Appeal denied the claim finding:

> The court herein did not abuse its discretion in denying the bifurcation motion.  The evidence of appellants' gang activities were necessarily intertwined within the robbery charges in this case.  The robbery suspects wore and displayed red bandanas, one suspect wore a belt buckle with an "N," all three appellants were members of the Nortenos, the eyewitnesses described the suspects' distinctive gang tattoos which were clearly visible beneath their hats and masks, and the white truck, believed to be the getaway car, was registered to the wife of the older brother of Jose and Willie—Paul "Mug" Lopez, an active leader in the Norteno gang.  The gang evidence was also relevant to link the appellants to the commission of the substantive offenses: Jose and Willie were brothers with extensive involvement with the Norteno gang, they were acquainted with the family of a major Norteno leader (Gratton), and Lawrence admitted his long-term involvement with the Nortenos and knowledge of their older brother, Paul Lopez.  Jose's postarrest statements to his family necessarily amounted to admissions of his involvement in the robberies, but he complained to his girlfriend that the police found the gang paraphernalia in her house and admonished her not to send any gang photographs to him in jail.  Jose's statements to the Santana family contained the descriptive phrase that he had done a job and the police were looking for him.  Lawrence's postarrest statements suggested the motive for the robberies, when Lawrence said he did not keep the money but gave everything to a third party.  As we will explain, *post*, Detective Delgado relied on Lawrence's statements and explained the robberies were committed to benefit the gang because they gave the money to another party instead of keeping it for themselves.

> We note that appellants were also charged with count VII, the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)).  Only Jose and Lawrence were convicted of this offense, and the jury was unable to reach a verdict as to Willie.  As relevant to the charges in this case, "to entirely eliminate the gang evidence would have required a severance ... of the street terrorism count and the bifurcation of the gang enhancements." (*People v. Burnell* (2005) 132 Cal.App.4th 938, 947.)  Willie's bifurcation motion, as joined in by Jose, also sought severance of count VII, but the court properly denied the severance motion.  Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses carries a very heavy burden to "'*clearly establish* that there is a substantial danger of prejudice requiring that the charges be separately tried'" before such a severance can be granted.  (*Id*. at p.946; see § 954.)  "Severance of charged offenses is a more inefficient use of judicial resources ... because severance requires selection of separate juries, and the severed charges would always have to be tried separately ...." (*Hernandez, supra,* 33 Cal.4th at p. 1050.)

> As applicable to the instant case, the substantive street terrorism count required much the same evidence to prove, and was no more potentially inflammatory than the other charges, such that severance would not have been appropriate.  (See, e.g., *Hernandez, supra,* 33 Cal.4th at p. 1051.)  Moreover, the gang evidence was cross-admissible in this joint trial given the existence of the substantive charge.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 985 [no possible prejudice to admit evidence if cross-admissibility satisfied].)

> Finally, the court herein instructed the jury with CALCRIM No. 1403, on the limited purpose of the gang evidence:

You may consider evidence of gang activity only for the limited purpose of deciding whether:

The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged; [¶] . . . [¶]

You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.

We presume the jury followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

(Lodged Doc. No. 4, Opinion, at 86-88.)

The Court of Appeal reasonably concluded that the failure to bifurcate the gang enhancement did not render Petitioner's trial fundamentally unfair. The gang enhancement evidence would have otherwise been admitted as to the substantive gang offense, and even assuming the trial court erred in denying the motion to bifurcate, there is no prejudice. The gang evidence was properly admitted to prove intent, purpose, and knowledge as to the robbery charges. Thus, the gang evidence assisted to "link the appellants to the commission of the substantive offenses" and prove that "the robberies were committed to benefit the gang because they gave the money to another party instead of keeping it for themselves." (Lodged Doc. No. 4, Opinion, at 86-87.) In addition, the substantive offense of active participation in a street gang was no more inflammatory than the other evidence admitted and severance was not required. Moreover, any prejudice was further limited through the instruction that directed the jury to consider the evidence of gang activity to show whether he acted with the intent, purpose, and knowledge, and not for the conclusion that he is a person of bad character or a disposition to commit the crime. Accordingly, there is no showing that the refusal to bifurcate the gang evidence had a substantial and injurious effect or influence in determining the jury's verdict. Brecht, 507 U.S. at 637. Thus, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

I.    Cumulative Error

Petitioner alleges that the foregoing errors resulted in prejudice cumulatively.

1    "The cumulative effect of multiple errors can violate due process even where no single

2    error rises to the level of a constitutional violation or would independently warrant reversal." Parle

3    v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284, 290

4    n.3 (1973)).  Where, as here, there was no error, there can be no cumulative error.  Mancuso v.

5    Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); United States v. Rivera, 900 F.2d 1462, 1471 (9th Cir.

6    1990) ("a cumulative-error analysis should evaluate only the effect of matters determined to be

7    errors, not the cumulative effect of non-errors").  Accordingly, habeas relief is not warranted.  28

8    U.S.C. § 2254(d)(1).

9    J.    Joinder In Petitions For Habeas Corpus Relief Filed by Co-Defendants

10    Petitioner and his co-defendants Willie Torres and Lawrence Mejia filed timely state court

11   appeals in which they joined the arguments made by one another.  As previously stated, the

12   California Court of Appeal affirmed all of the judgments.  On March 5, 2008, Petitioner filed a

13   petition for review in the California Supreme Court, and joined all issues raised by his co-

14   defendants in their petitions.  (Lodged Doc. No. 5, at 35.)  The petition was summarily denied on

15   May 14, 2008.  (Lodged Doc. No. 6.)  Willie Torres filed a petition for writ of habeas corpus in

16   this Court on March 2, 2009, in case number 1:09-cv-00384-GSA HC.  That petition was denied

17   on the merits on September 14, 2009.  (1:09-cv-00384-GSA HC, Court Doc. 14.)  Petitioner filed

18   the instant petition for writ of habeas corpus on April 27, 2009.  To date, Lawrence Mejia has not

19   filed a petition for writ of habeas corpus.

20    A plaintiff may properly join as many claims as he has against an opposing party.

21   Fed.R.Civ.P. 18(a).  However, joinder as defendants in one action is only "if there is asserted

22   against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of

23   the same transaction, occurrence, or series of transactions or occurrences and if any question of

24   law or fact common to all defendants will arise in the action."  Fed. R.Civ. P. 20(a).  In practice,

25   claims involving different parties cannot be joined together in one complaint if the facts giving rise

26   to the claims were not related in some way-that is, if there was not "similarity in the factual

27   background of the claim."  Coughlin v. Rogers, 130 F.3d 1348, 1351 (9th Cir. 1997).

28

K.      Payment For Preparation of Probation Report

        Petitioner claims the trial court erred by ordering him to pay $900 for the preparation of the probation report.  Respondent correctly points out that this claim was not presented to the California Supreme Court and is not exhausted.  In any event, the claim is clearly without merit because its fails to present a federal issue and must be denied.  28 U.S.C. § 2254(d)(2); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a district court may deny an unexhausted claim when it is perfectly clear there is no chance of prevailing.)

        Habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985).  Accordingly, Petitioner's claim is plainly without merit and habeas corpus relief is foreclosed.

RECOMMENDATION

        Based on the foregoing, it is HEREBY RECOMMENDED that:

        1.      The petition for writ of habeas corpus be DENIED; and,

        2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

        This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

        IT IS SO ORDERED.

**Dated:   November 24, 2009**                  **/s/ Dennis L. Beck**
                                    UNITED STATES MAGISTRATE JUDGE